UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

CAROLYN E. JONES,
      Plaintiff

v.

WILLIAM A. MASON, CHIEF
OF POLICE, HARWICH POLICE
DEPARTMENT, and the TOWN
OF HARWICH,
      Defendants

---

Civil Action No.
04-10133-MEL

## DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Local Rule 56.1 and in support of their motion for summary judgment, defendants Town of Harwich (the "Town") and William A. Mason, Chief of the Harwich Police Department ("Chief Mason") submit this statement of material facts as to which there is no genuine issue to be tried.[1]

### INTRODUCTION

### The Parties

1.)   Defendant Town of Harwich (the "Town") is a

      political subdivision of the Commonwealth of

---

[1] Record citations contained herein are to the attached appendices.

Massachusetts and is located in Barnstable
County.

2.)   Defendant William Mason ("Mason") is a resident
      of the Town of Harwich, Barnstable County,
      Commonwealth of Massachusetts.  He is the Chief
      of the Harwich Police Department (the
      "Department").  <u>Mason Affidavit</u> at ¶2.[2]

3.)   Mason was appointed chief of the Department on
      April 10, 2000.  Id. at ¶2.  Upon assuming the
      position, the Town's selectmen charged Mason
      with the responsibility of modernizing the
      Department's law enforcement capabilities and
      its hiring practices.  <u>Id</u>. at ¶3; <u>Mason
      Deposition</u> at 43.[3]

4.)   Mason is a graduate of the FBI National Academy
      in Quantico, Virginia.  He holds Masters
      Degrees in Public Administration and Criminal
      Justice.  He is working towards a Doctorate of
      Philosophy in Public Administration.  <u>Id.</u> at ¶4

5.)   Plaintiff Carolyn Jones is a resident of
      Hyannis, Massachusetts. <u>Complaint</u> at ¶1.

---

[2] Tab 1.
[3] Tab 2.

### History of Jones' Employment With the Town

6.) On July 1, 1999, Jones was hired by the
department as a part-time special police
officer and a full-time civilian dispatcher for
the Harwich Police Department.  Id. at ¶4.

7.) Dispatchers are responsible, inter alia, for
answering and directing the Department's
internal radio communication. Mason Affidavit
at ¶6. Dispatchers in the town are members of a
collective bargaining unit which also includes
the Town' full-time police officers. Id. at ¶6.

8.) Prior to Chief Mason's arrival in June of 2000,
special police officers were classified into
three categories: seasonal, part-time, and
full-time each of which had different
responsibilities.  Seasonal specials were hired
for the summer period (June – August) primarily
for directing traffic and parking enforcement.
After completing the Intermittent Police
Academy, they received minimal field training
prior to assuming their duty assignments.
Seasonal specials were not "cruiser qualified."
Part-time specials were primarily utilized to
fill traffic details and work non-cruiser

assignments when regular officers were unable to fill the vacancies.  Like seasonal specials, after completing the Intermittent Police Academy, they received minimal field training prior to assuming their duty assignments. Part-time specials were **not** "cruiser qualified."  Carolyn Jones was a part-time special.  Full-time specials were utilized to supplement sector assignments as a budgetary consideration rather than expending overtime that would be created by assigning a regular officer.  This was also used as a method to avoid hiring additional regular officer positions.  Full-time specials worked a regular assignment often approaching and sometimes exceeding the 40 hour work week.  After completing the Intermittent Police Academy, they received more extensive field training to become "cruiser qualified" prior to assuming their duty assignments.  Id. at ¶7

9.) Special police officers in the Town are not members of a collective bargaining unit. <u>Jones Deposition I</u> at 45.[4]

10.) Jones resigned her position as a full-time civilian dispatcher in January 2001. <u>Complaint</u> at ¶9.

11.) After her resignation, Jones continued to work as a part-time special police officer for the Department. <u>Mason Affidavit</u> at ¶8. From January 2001 until November 2002, Jones worked approximately 10 hours per week as a part-time special officer. <u>Id.</u> at ¶8. Her duties involved primarily traffic details and occasionally assisting with animal control responsibilities during the absence of the full-time animal control officer. <u>Id.</u> at ¶8.

12.) In or about November 2002, Jones was rehired by the Department as a full-time civilian dispatcher. <u>Jones Deposition I</u> at 51.

13.) On June 17, 2003, Mason asked the Town's selectmen to terminate Jones' employment as a full-time dispatcher and part-time special

---

[4] Tab 3

officer. <u>Mason Affidavit</u> at ¶10.  In a letter

to the selectmen, Mason explained:

> "Dispatcher Jones' actions in this [her
> failure to follow the chain of command,
> failure to follow policies and
> procedures of the Department, her
> efforts to manipulate departmental
> records, and her untruthfulness]and the
> prior incident are unacceptable, have
> negatively affected her professional
> reputation, as well as reflecting
> poorly on her credibility and the
> reputation of the Harwich Police
> Department…The serious nature of these
> incidents causes me to question this
> employee's credibility and
> truthfulness; therefore, I find it
> unnecessary to continue my evaluation
> during the remainder of her
> probationary period."

14.) On June 18, 2003, the selectmen terminated

Jones' employment with the Town. <u>Complaint</u> at

¶28.


**Special Police Officers on Bike Patrol**

15.) At some point toward the end of the Summer of

2000, special police officers were permanently

removed from the Town's bike patrol unit.

<u>Mason Deposition</u> at p. 43.  Prior to Chief

Mason's arrival with the Department, anybody

who wanted to ride on a bike patrol was allowed

to do so.  <u>Mason Deposition</u> at p. 43.

16.) In 2001, Mason began the process of
professionalizing the bike patrol unit.  As a
result, Mason appointed Sergeant Chris Kender
to head up the bike patrol unit.  <u>Mason</u>
<u>Deposition</u> at p. 43.

17.) No special police officers within the
Department were allowed to apply to become bike
patrol officers.  Mason decided to
professionalize the bike unit in order to
provide more opportunities to regular Harwich
Police Officers who invested their lives in the
Department, and give them more opportunities
for advancement and professionalism.  <u>Mason</u>
<u>Deposition</u> at p. 44.

18.) Only regular full-time officers are allowed to
serve on the bike patrol unit.  Once an officer
is selected by the Chief to serve on the bike
patrol unit, he or she receives training at a
national academy which is run by the
International Police Officers Mountain Bike
Association.  <u>Mason Deposition</u> at p. 44.  Each
bike patrol officer is issued a custom made
uniform and a custom fit bicycle, which is

issued as a piece of duty equipment.  Mason

Deposition at p. 45.

19.) The bike patrol unit presently consists

exclusively of full-time regular police officer

in the Town.  Hutton Deposition at p. 78.[5]


**Special Police Officers Driving Police Cruisers**

20.) Once an officer at the Harwich Police

Department has been deemed "cruiser qualified,"

he or she is able to take a patrol car out on

his or her own and fill a beat or sector

assignment.  When an officer is "cruiser

qualified" he or she is able to conduct patrols

in marked police vehicles.  Mason Deposition at

p. 46.

21.) A "cruiser qualified" officer is capable of

handling a variety of calls, ranging from

writing a ticket to responding to a burglary.

Mason Deposition at p. 52.  A "cruiser

qualified" officer is also able to handle a

police vehicle under emergency conditions.

Mason Deposition at p. 52.

---

[5] Tab 4

22.) Since Chief Mason's arrival in Harwich, there has not been a single special police officer who has become "cruiser qualified." This was caused by Mason's decision to professionalize the Department and give regular full-time police officers a higher status within the Department. Mason Deposition at p. 54.

23.) Carolyn Jones was one of several special police officers in the Department who were not allowed to become "cruiser qualified." Further, when Mason became Chief of Police there were approximately three special officers at the time who had already been determined to be "cruiser qualified." The three included: Jim Chevrie, Tracy Clark and Keith Eldredge. Mason Deposition at p. 55. These same three individuals were the last, and only, special police officers hired as full-time regular officers before Mason's hiring process went into effect. Mason Deposition at p. 66.

24.) Chief Mason presently has no intention of allowing special police officers to become "cruiser qualified." Mason Deposition at p. 56.

### Jones' Union Activity

25.) Jones was elected to the position of Union
Secretary at approximately the same time that
her second tour of duty as a full-time
dispatcher with the Town of Harwich began.
Hutton Deposition at p. 18.

26.) During the meeting at which the election of
Jones as Union Secretary was discussed, someone
raised the issue of whether or not Jones could
serve in that position if she was probationary.
Hutton Deposition at p. 20.  The Union
membership, without consulting with IBPO
Business Agent Sean McArdle or anyone in the
police administration, came to the conclusion
that Jones was not a probationary employee and
was therefore qualified to serve as Union
Secretary.  Hutton Deposition at pp. 20-22.

27.) Once elected to the position of Union
Secretary, Jones also became part of the
Union's negotiating committee.  Hutton
Deposition at p. 23.  Officers Terry Dinnan,
Adam Hutton and Dispatchers William Willis and

Carolyn Jones constituted the Union's

negotiating team.   Hutton Deposition at p. 23.

28.) Between 2002 and 2003 one of the issues the

negotiating team was dealing with had to do

with overtime distribution in the Department.

Hutton Deposition at p. 26.   There were a

couple of meetings between the negotiating team

and Lieutenant Mitchell and Chief Mason.

Hutton Deposition at p. 26.

29.) Jones attended most of these meetings at which

there was no designated spokesperson on behalf

of the Union.   The negotiating team as a whole

voiced its opinion as to how the issue of

overtime distribution at the Department should

be resolved.   There were no specific instances

where Jones was critical of the Police Chief or

police administration at these meetings.

Hutton Deposition at p. 26; Jones Deposition II

at p. 25.[6]

30.) Dispatcher William Willis was serving as Union

President when Ms. Jones was elected Union

Secretary and had no personal recollection of

---

[6] Tab 5

Jones being vocal and outspoken with the Chief
of Police.  <u>Willis Deposition</u> at p. 25.[7]

31.) At some point after the start of his tenure
with the Harwich Police Department, Chief Mason
instructed the American flag to be removed from
the Department's uniforms and changed to a
patch on the uniform.  <u>Jones Deposition II</u> at
p. 15.  Jones voiced her displeasure over this
to other members of the Union, but never
addressed her concerns to the police
administration or the Chief of Police.  <u>Jones
Deposition II</u> at p. 16.

32.) Jones was prohibited from doing bike patrol
some time after Chief Mason's tenure with the
Department began.  She voiced her concerns to
other members of the Union but does not recall
voicing those concerns to anyone in the
administration of the police department.  <u>Jones
Deposition</u> II at p. 18.

**Paid Detail During a Snow Storm**

33.) Plaintiff, Jones, was scheduled to work a
detail assignment on February, 18, 2003.  The

_____

[7] Tab 6

start time for the detail was 7:00a.m.  <u>Jones</u>

<u>Deposition I</u> at 134.

34.) Cape Cod had experienced a major snow storm the

night before and Jones sought to contact the

Harwich Police Department on the morning of

February 18, 2003 to determine if the detail

assignment she was scheduled to work had been

cancelled.  <u>Jones Deposition I</u> at p. 136.

35.) Between 5:00a.m. and 7:00a.m. on the morning of

February 18, 2003, Jones contacted the Harwich

Police Department and spoke with Dispatchers

Donna Tavano and Amy Clough.  <u>Jones Deposition

I</u> at p. 138.

36.) Jones also contacted Officer Ted Cronin, who

was the officer she was scheduled to work the

detail with, "in the area of 7:00a.m."  <u>Jones

Deposition I</u> at p. 141.  Cronin was not aware

that the detail had been cancelled.  <u>Jones

Deposition I</u> at p. 144.

37.) David Jasic is a sergeant with the Harwich

Police Department.  <u>Jones Deposition I</u> at p.

145.  On the morning of February 18, 2003,

before Jones' detail assignment was scheduled

to begin, Dispatcher Donna Tavano sought

guidance from Sergeant Jasic as to how Jones
should proceed regarding her detail assignment.
Jones Deposition I at p. 146.

38.) Sergeant Jasic instructed Dispatcher Tavano to
inform Jones that she should try to get in if
possible, considering the detail had not been
cancelled.  Jones Deposition I at p. 149.

39.) Officer Cronin went to the site of the detail
assignment and notified Jones that it appeared
as though nobody was there.  Jones Deposition I
at p. 151.  Jones never reported for her detail
assignment on February 18, 2003.  Jones
Deposition I at p. 157.

40.) Subsequently, Jones submitted a slip to be paid
for the February 18, 2003 detail incident.
Jones Deposition I at p. 164.

41.) Upon discovering that Jones had failed to
report for her detail assignment on February
18, 2003, Chief Mason ordered her wages reduced
in order to recoup the money which had already
been paid to Jones.  Mason Deposition at p.
110.

42.) After learning that Mason had reduced Jones'
wages, IBPO Business Agent Sean McArdle

requested a meeting with Chief Mason.  McArdle
Deposition at p. 30.[8]  As a result of the
meeting between McArdle, Jones and Mason, the
Chief agreed to allow Jones four hours of
compensatory time.  Mason Deposition at p. 112.
The agreement to provide Jones with four hours
of compensatory time afforded her about half of
what she would have gotten if she were paid for
the detail.  Mason Deposition at p. 117.


### Investigation Regarding Jones' Request for Leave on April 15, 2003

43.) On April 15, 2003, Jones called in to the
Harwich Police Department and spoke with
Dispatcher William Willis.  Jones Deposition I
at p. 86.  Jones sought to take holiday or sick
time because she was not going to be able to
report for her assigned shift.  Jones
Deposition I at p. 88.

44.) Jones spoke to Willis about "taking some time
off," and asking "about the book." Willis
Deposition at p. 33.  Willis informed Jones he
did not have the book and that Sergeant Chris

---

[8] Tab 7

Kender had the book.  Willis informed Jones
that she could speak with Sergeant Kender if
she wished.  Willis Deposition at p. 33.  Jones
did not want to speak with Sergeant Kender and
asked Dispatcher Willis to put her out sick.
Willis Deposition at p. 33.

45.) At some point before the conclusion of their
conversation on April 15, 2003, Jones told
Willis that if he saw the schedule before
anybody else to give her a holiday, but if it
was going to be "too much of a pain" to put her
out sick.  Willis Deposition at p. 36.

46.) Jones was subsequently investigated by
Lieutenant Barry Mitchell for her conversation
with Willis.  Mitchell Deposition at p. 117.[9]

47.) Approximately one hour after Mitchell contacted
Jones to inform her of an investigation into
her sick leave use, Jones called Mitchell and
notified him that she was injured at the firing
range.  Mitchell Deposition at p. 122.

---

[9] Tab 8

## HIRING PROCESS IMPLEMENTED UNDER CHIEF WILLIAM MASON

48.) In May of 2001, the Harwich Town Meeting voted to approve three upgraded positions and four new police officer positions.  Mason Deposition at p. 61.

49.) An announcement of the new positions was placed on the police department's bulletin board. Mason Deposition at p. 73.

50.) Applicants were required to fill out an application and take an examination.  Mason Deposition at p. 64.  The examination was held on June 30, 2001.  Mason Deposition at p. 68.

51.) More than 100 applicants took the examination. Mason Deposition at p. 76.

52.) Chief Mason would call the top three individuals off of the eligibility list and interview them.  Mason Deposition at p. 77.

Respectfully submitted,
**TOWN OF HARWICH and
WILLIAM MASON,**
By their attorneys,


Robert J. Van Campen,
BBO#648638
Eugene J. Sullivan III,
BBO#656497
GILMAN/ HOLTZ, P.C.
25 New Chardon Street
Boston, MA 02114
(617) 720-2663

# APPENDIX ONE

## AFFIDAVIT OF WILLIAM A. MASON

I, William A. Mason, upon my oath do solemnly swear and affirm that:

1. I am a resident of the Town of Harwich, Barnstable County, Commonwealth of Massachusetts.

2. I presently serve as Chief of Police for the Town of Harwich Police Department.  I was appointed to this position on April 10, 2000 and took office June 26, 2000.

3. Upon assuming the position, the Board of Selectmen for the Town of Harwich charged me with the responsibility of modernizing the Department's law enforcement capabilities, training, and its hiring practices.

4. I have attained a Bachelors of Science Degree in Law Enforcement, Sociology, and Political Science from Metropolitan State College in Denver, Colorado, Masters Degree in Public Administration, as well as a Masters Degree in Criminal Justice from the University of Colorado. I have completed course work toward a Doctorate of Philosophy in Public Administration also from the University of Colorado, Graduate School of Public Affairs. I am a graduate of the 172nd session of the FBI National Academy in Quantico, Virginia

5. On July 1, 1999 Carolyn Jones was hired by the Harwich Police Department as a full-time dispatcher and special police officer.

6. Dispatchers are responsible, among other things, for answering and directing the Department's internal radio communications.  Dispatchers in the Town are members of a collective bargaining unit which also includes the Town's full-time police officers.

7. Prior to my arrival in June of 2000, special police officers were classified into three categories: seasonal, part-time, and full-time each of which had different responsibilities.  Seasonal specials were hired for the summer period (June – August) primarily for directing traffic and parking enforcement.  After completing the Intermittent Police Academy, they received minimal field training prior to assuming their duty assignments.

Seasonal specials were not "cruiser qualified." Part-time
specials were primarily utilized to fill traffic details
and work non-cruiser assignments when regular officers were
unable to fill the vacancies. Like seasonal specials,
after completing the Intermittent Police Academy, they
received minimal field training prior to assuming their
duty assignments. Part-time specials were **not** "cruiser
qualified." Carolyn Jones was a part-time special. Full-
time specials were utilized to supplement sector
assignments as a budgetary consideration rather than
expending overtime that would be created by assigning a
regular officer. This was also used as a method to avoid
hiring additional regular officer positions. Full-time
specials worked a regular assignment often approaching and
sometimes exceeding the 40 hour work week. After
completing the Intermittent Police Academy, they received
more extensive field training to become "cruiser qualified"
prior to assuming their duty assignments.

8. Jones resigned her position as a dispatcher in January,
   2001. After her resignation, Jones continued to work as a
   part-time special police officer for the Department. From
   January 2001 until November 2002, Jones worked
   approximately 10 hours average per week as a part-time
   special officer. Her duties involved primarily traffic
   details and occasionally assisting with animal control
   responsibilities during the absence of the full-time animal
   control officer.

9. Jones was rehired by the Town of Harwich as a dispatcher in
   November, 2002. Upon her rehire, Jones was informed that
   she was considered a new hire and would not retain any of
   her previous seniority privileges or rights.

10. On June 17, 2003, I recommended to the Board of Selectmen
    that Ms. Jones' employment as a full-time dispatcher and
    part-time special officer be terminated. In a letter to
    the selectmen, I explained:

    "Dispatcher Jones' actions in this [her failure to
    follow the chain of command, failure to follow
    policies and procedures of the Department, her efforts
    to manipulate departmental records, and her
    untruthfulness]and the prior incident are
    unacceptable, have negatively affected her
    professional reputation, as well as reflecting poorly
    on her credibility and the reputation of the Harwich

Police Department…The serious nature of these incidents causes me to question this employee's credibility and truthfulness; therefore, I find it unnecessary to continue my evaluation during the remainder of her probationary period."

11.     Prior to August of 2001, regular police officers and special police officers were assigned to the bicycle patrol unit.  The bike patrol unit is an alternative method of law enforcement service which has a long and successful history throughout the United States and in other countries.  With the regional increased popularity of trails, parks, beaches, and special events, as well as additional vehicular congestion and pedestrian traffic, bicycle patrol is an efficient and effective means of providing public safety services to the Town of Harwich.  Properly administered, equipped, and deployed, the Bicycle Patrol Unit can promote law enforcement objectives, community safety, public interaction, and a positive citizen perspective of the Police Department.  The Bicycle Patrol Unit is seen as a key element in successful community policing efforts; therefore, officers applying for or selected as members of the Bicycle patrol Unit must be committed to the ideals and philosophies of its mission.

12. In or around October, 2000, I consulted with the Department's staff and determined that the existing bicycle patrol program was not properly equipped, trained, or organized in a manner that provided quality and effective services to the community.  At this point the bicycle patrol program was completely disbanded.  It was reorganized into a formalized Bicycle Patrol Unit where selection was based upon a competitive selection process, nationally recognized training standards, professional equipment, and specialized uniforms.  The average cost to equip and train a member of the Bicycle Patrol Unit is $4,000; therefore, the number of individuals allowed in the Unit had to be limited.  Utilization of part-time specials is not cost effective when the same resources can be expended on regular officers.

13. Therefore, around October, 2000, **all** special and regular officers (and supervisors) at the Harwich Police Department, including Carolyn Jones, were removed from performing bicycle patrol duties.  Only regular officers were allowed to apply for the reorganized and established Bicycle patrol Unit.

14. No employee of the police department is allowed to drive a marked police sedan ("cruiser") for sector assignment duties unless he or she is "cruiser qualified." Since June, 2000, in order to become "cruiser qualified" an employee must complete and demonstrate proficiency in the 10 week field training instruction program in addition to basic and in-service training requirements. All regular police officers for the Town of Harwich are "cruiser qualified."

15. Since my appointment and arrival as Chief of Police, and between 2000 and 2003, the only special police officers who have been allowed to do cruiser patrols were all deemed cruiser qualified before my arrival in the Department.

16. In 2001 I made the decision to no longer allow any additional special officers to become "cruiser qualified." I made this decision due to several factors but primarily because: 1) regular police officer staffing levels increased reducing the dependence upon less-trained special officers; 2) sector assignments were prioritized to regular police officers who have elected to make being an officer of the Harwich Police Department their full-time career; 3) the 10 week field training instruction program is both staff intensive and cost prohibitive (paying salary to both the student and instructor); 4) the duties, requirements, public expectations, and civil liability is equal between special and regular officers when assigned and functioning in like capacities; therefore, the more fully trained regular officer is professionally advantageous for sector assignments.

Signed under the pains and penalties of perjury that the above statement is true and accurate to the best of my knowledge, recollection and belief.

_William A. Mason_
William A. Mason

DATED: _Nov. 23, 2004_

# APPENDIX TWO

1     A.   Who in my staff, sergeants, Lieutenant

2   Gomes at the time.  And those people

3   specifically.  The sergeants and Lieutenant

4   Gomes.

5     Q.   What was the change in the bike patrol?

6     A.   The bike patrol prior -- prior to me

7   getting there, the bicycle patrol unit was

8   basically, anybody that wanted to ride the

9   bike, was allowed to ride the bike.

10          My background is that, I ran a

11   professional bicycle patrol unit in Colorado,

12   and there are certain standards that I believed

13   to be appropriate for the use of a bicycle

14   enforcement.  And it was part of my direction

15   from the board of selectmen upon being hired to

16   bring the department into the 21st century, and

17   to professionalize the department.

18     Q.   And so in 2001 you had a process to

19   apply; is that what I understand?

20     A.   Yes.

21     Q.   And who set that process?

22     A.   I did.  Along with Sergeant Chris

23   Kender, who was in charge of the bicycle unit.

24     Q.   And any specials who were allowed to



1    apply?

2    A.    Sorry?

3    Q.    Were special officers allowed to apply?

4    A.    No special police officers were allowed

5    to apply, for multiple reasons.  Predominantly

6    cost.

7    Q.    How is that?

8    A.    The bicycle patrol unit, as it is

9    functioning now, costs me almost $4,500 per

10   officer.

11         I wanted to give more options to the

12   regular police officers who have decided to

13   make the Harwich Police Department a career,

14   and give them more options to professionalize

15   and move and do other things.

16         And the bicycle patrol unit was one

17   of the first things we did.  The bicycle -- all

18   my bicycle patrol officers go to a national

19   academy put by an IPMBA, International Police

20   Officers Mountain Bike Association.

21         It is probably the toughest bicycle

22   patrol school there is.  At least they argue

23   that point.  They have custom made uniforms

24   made by Brachtware out of Tacoma, Washington.

1           Their bicycles are custom fitted to them, and

2           issued to them as a piece of duty equipment.

3                   And when you had that, all you, with

4           all the training, it comes up to about $4,500

5           for me.  I would not get a return for someone

6           who is a part-time employee, who is not -- was

7           not -- not made the commitment to stay with the

8           department.

9           Q.  So since then no special police officer

10          was on bikes?

11          A.   No special police officers on bicycles

12          whatsoever.  With the -- one exception.  Ms.

13          Jones, was assigned the Cranberry Harvest

14          Festival.  And she was in a inner perimeter.

15          She had to move between two duty posts.  And

16          that particular point, we didn't have enough

17          golf carts to go around to allow people --

18          which we now use golf carts, and she was

19          allowed to use a bicycle to go from point "A"

20          to point "B" on a detail assignment.

21                  But she is not allowed to patrol with

22          her bike.  But she is the only one that was

23          allowed to do that.

24          Q.   Cruiser qualified, what does that mean?

1      A.   Cruiser qualified was another issue that

2   had come up prior to me getting here.

3           Cruiser qualified means you are able

4   to take a patrol car out on your own and fill a

5   beat or sector or assignment, in addition, you

6   are allowed to use a cruiser, obviously, if a

7   detail becomes available where a cruiser is

8   required.  Cruiser being a marked police

9   vehicle

10     Q.   And are officers driving a cruiser for

11  any purpose if you are not cruiser qualified?

12     A.   Sorry I didn't hear you.

13     Q.   Can you drive a police cruiser for any

14  purpose if you are not cruiser involved?

15     A.   Yes.  Taking them to the shop for

16  repair.

17     Q.   Anything else?

18     A.   On occasion they are used to run

19  errands.  In other words, to go pick something

20  up or deliver something.  But we -- we

21  didn't -- if we didn't have any other vehicle

22  available.

23     Q.   What about details?

24     A.   The details, there's a policy written on



1          And again, again, Counselor, I'm

2    doing the best I can on dates, but without

3    checking the records, I cannot tell you

4    specifically.

5    Q.   So is there a specific program, if I

6    wanted to look at something and said this is

7    what I have to do to become cruiser qualified,

8    is there something that would tell me what

9    that is?

10   A.   Yes.

11   Q.   What is that?

12   A.   The field training and instruction

13   manual.

14   Q.   Would that tell me how many times I

15   would have to drive with someone who is, and

16   what courses for qualification?

17   A.   It's by far more than just driving

18   around.  It's a variety of actions to handle

19   certain types of calls, from everything from a

20   parking ticket to domestic violence to a

21   burglary.

22          It's how to operate the vehicle and

23   under emergency conditions; how to make traffic

24   stops, it's -- it's virtually every functional

1    one of the things that I went to change, was to

2    upgrade the position of a regular police

3    officer and to give them a higher status over

4    specials and seasonal specials.

5            .       After my first summer here, I

6    eliminated seasonal specials, and did not have

7    them at all.  The special officers that were

8    cruiser qualified, were all cruiser qualified

9    prior to me getting here.

10   Q.   Did you review their qualifications?

11   A.   Yes, I did.

12   Q.   And were you satisfied that all of them

13   were qualified?

14   A.   Yes.  Most of them have been doing it

15   for years, have been functioning on their own.

16           In addition, the four special police

17   officers that were cruiser qualified later

18   became regular police officers, or those four

19   that became regular police officers were

20   full-time special -- special police officers,

21   meaning that they worked a 40 hour schedule in

22   the field as a regular police officers, they

23   functioned just the same as a regular police

24   officer.

1    Q.    Who was that?

2    A.    Okay.   That was -- I stand corrected.

3    There's three, because Neil Noland had already

4    been hired as a full-time regular police

5    officer before I got here.   But he was one of

6    them.   And then there was Jim Cheverie.   Tracy

7    Curren, who is now Tracy Clark, and Keith

8    Eldredge.

9    Q.    Were there any other special police

10    officers besides Ms. Jones who were not

11    cruiser qualified when you came here?

12    A.    Yes.   There are currently several that

13    are not cruiser qualified.

14    Q.    Who are they?

15    A.    Sorry, if would you give me -- I can

16    tell you which are cruiser qualified and then

17    everybody else is not.

18    Q.    Who is.

19    A.    John Sullivan, Senior.   He's been

20    cruiser qualified for I believe 20 years.

21    Bob Curry, Robert Curry, has been

22    cruiser qualified for approximately 20 years.

23    Keith Lincoln, and he was cruiser

24    qualified, again, before I got here.   And I

1    officers, which were Tracy Curren, Jim

2    Cheverie, and Keith Eldredge.

3         Those were the first three positions

4    that I hired.  The four additional new

5    positions were all hired under the new system,

6    using the testing process.

7    Q.   The question is when?

8    A.   I'm going to have to -- I would have to

9    sit -- I would have to pull out my records.  I

10   apologize.  It might have been -- it was the

11   year following that annual town meeting that

12   approved the new positions.

13   Q.   Do you have any knowledge of when,

14   anything that would show you when that was?

15   A.   The test was given -- I remember that

16   once the vote was in, we put out the

17   announcement to create the eligibility list.

18   Q.   Doesn't that -- if it's in 2001, she

19   would have, you have been on the job for a

20   year plus, by the time you get to the 2001

21   town meeting, the May or September town

22   meeting?

23   A.   No, it's a May town meeting.  And when

24   the positions were approved, we immediately

1    would -- I want to say like 1997, 1998,

2    somewhere in that general area.

3          I now have one officer that was a

4    full-time regular officer who wanted to go into

5    his own business, and he had been a full-time

6    regular officer for five or six years, and he

7    requested to become a special officer, so he

8    could work a couple of days a week.  And that

9    is Eddie Silva.  And, obviously, since he was

10   five years as a regular officer, obviously he

11   was cruiser called and full-time through the

12   regular police officer academy and field and

13   training instruction.

14   Q.   Are there any plans to train officers to

15   become cruiser qualified?

16   A.   Absolutely none.

17   Q.   Why not?

18   A.   Why not.  It's not cost effective.

19   Q.   Can you estimate how long it takes to

20   train someone or what it costs?

21   A.   For me to hire a brand new police

22   officer, equip them and send them to the

23   academy and field training, I know that costs

24   me; that costs me about $58,000.

1    bills every 15 days.  I could not swear to

2    that, it might be every 30 days.  Might be

3    monthly.  But we have a lot of companies that

4    contract on a regular basis, like Verizon, Key

5    Span, certain companies that will have an

6    ongoing detail.

7            So if it's a one shot detail, they

8    usually bill that immediately.  But if it's

9    something -- some that -- some have details

10   every month, I think she bills on a monthly

11   basis.

12   Q.   So the incident came prior to the

13   billing going out to this company, the issue

14   came to light that she be paid?

15   A.   Yes.

16   Q.   But you simply ordered that the money be

17   taken out of the paycheck, correct?

18   A.   Yes.

19   Q.   And that happened, correct?

20   A.   Yes.

21   Q.   And then you had a meeting with Mr.

22   McArdle and Ms. Jones?

23   A.   Yes.

24   Q.   And who requested that?

1    Q.   What was said.

2    A.   During that meeting we had discussed the

3    issue about the taking of the pay.

4    Q.   Okay.  What did Mr. McArdle say?

5    A.   Mr. McArdle said that I had done that

6    inappropriately.

7         Prior to this I had consulted with

8    town counsel, and they agreed with me that I

9    had done that inappropriately.  I did not

10   follow the proper procedure, not that I -- not

11   that it shouldn't have been done, but I didn't

12   follow the proper procedure.

13        And that procedure, and on a

14   grievance basis, would be -- you would probably

15   lose that, because of provisions which,

16   provisionally violates it and, and if I could

17   do something, to dispose of it.  Dispose of it.

18   Q.   So what did you do?

19   A.   Through negotiations with Mr. McArdle,

20   because of the inappropriate taking of the

21   money, I offered her four hours of comp time.

22   Q.   Was that put in writing somewhere?

23   A.   No, it was not.

24   Q.   Why not?

1      that special offices pay, which is probably

2      half of what the detail pay would have been.

3          Q.   But she wasn't entitled to anything?

4          A.   Your're absolutely right.  She wasn't.

5      But I had made an error.  And this was our

6      negotiated settlement of that error.

7                  So I would have been going back on my

8       word if I took further action to try and recoup

9       what I already agreed to give her to correct

10      the first error that I made.

11         Q.   Did Mr. McArdle ever argue to you that

12      she was entitled to be paid?

13         A.   No.  He argued the issue that I

14      improperly took the pay from her.

15         Q.   Did Ms. Jones ever argue to you that she

16      was entitled to be paid?

17         A.   I do not recall specifically.  She did

18      -- because there was another conversation that

19      I had with her over a memo.  But that,

20      basically, that dealt with issues around, not

21      whether or not she should be paid, but whether

22      or not, you know, about her side of the story.

23                  And I don't recall if she ever

24       specifically argued that she should have been

1     Q.   Was there a time when you were short

2     staffed?

3     A.   Sorry?

4     Q.   Was there a time when you were short

5     staffed?

6     A.   When I initially got here, yes.

7     Q.   So in 2000?

8     A.   Yes.

9     Q.   And how long did that go on for?

10    A.   I was approved for the three upgraded

11    positions and the four additional positions in

12    the May 2001 town meeting.

13    Q.   I believe you indicated that you started

14    hiring in early 2001, and then they came

15    onboard -- and they came onboard --

16    A.   Sorry?

17    Q.   When did you start the hiring process.

18    A.   It had to be after the vote, because it

19    went to over individual votes that took place

20    in May, towards the end of May.  And then the

21    new FY year doesn't start until July 1st. So I

22    started the hiring process -- I might have

23    actually put the advertising out after the

24    vote.  But I didn't actually start the hiring

1      A.   Yes.

2      Q.   And were there drafts and reviews that

3  went into that?

4      A.   Yes.  It went through staff.

5      Q.   Did the selectmen have to approve it?

6      A.   No.

7      Q.   When was this published, do you know,

8  there's no date on it?

9      A.   When was this published -- this came out

10  prior to the testing process.  It was posted

11  throughout the department.

12     Q.   So prior to the examination

13  announcement?

14     A.   Yes.

15     Q.   And do you know how long before the

16  examination deadline the examination was

17  posted?

18     A.   Several months.  And the reason why is,

19  because we are asking people in the department

20  to become involved in the oral boards and

21  doing backgrounds.  I mean, this is a major

22  shift for this department.  And so it was well

23  talked about, well publicized.  It was posted

24  throughout the department and posed at town



1   that point that I will hire nobody that has not

2   gone through the testing process.

3       Q.   You don't recall any further response

4   from Ms. Jones?

5       A.   Nothing that's -- no.   No.   I'm sure --

6   Counselor, I'm sure there was a response, but

7   I -- nothing that I can remember.

8       Q.   So you had already started to hire --

9   you already started the process of hiring; is

10  that correct?

11      A.   Yes.   I would have to look at the

12  documents, but I believe the test was on June

13  30th, I think.   The written test which is --

14  there was an application period, and then the

15  written test, I believe, it was on June 30th.

16      Q.   According to this source, your

17  affidavit, Ms. Jones was rehired December 2002

18  as a dispatcher, and you say the new hires had

19  started on July 1st for the new fiscal year of

20  that year; is that correct?

21      A.   I might have the year wrong.   I might

22  have the year wrong.   I thought -- I thought

23  that new positions were approved July of 2001.

24  It could have been they were approved -- would

1    effective December 1st 2002?

2    A.    Right.

3    Q.    And you met with her prior to that

4    point, correct.

5    A.    Yes.

6    Q.    And at that time you had a discussion

7    with her, she told you she wanted to become a

8    full-time police officer and you asked her

9    something about why she didn't apply; is that

10    correct?

11    A.    Yes.

12    Q.    Does that help?

13    A.    Yes.  Yes, because there was a document

14    that I presented that was the actual

15    announcement of that test.  And that has the

16    date when that test was being done, and,

17    obviously, that's when I did the test.

18    Q.    Can I take a look at that.

19         MR. VAN CAMPEN:  Do you want to look

20    at the whole packet.

21         (Discussion off the record.)

22    Q.    Exhibit 12 from Ms. Jones' deposition

23    announces a written examination to be given

24    June 30th of 2001?

1    A.    Yes.

2    Q.    So what professional association can you

3    refer me to or show me a document from that

4    says this is the process?

5    A.    National Association of Chiefs of

6    Police.    Massachusetts Association of Chiefs

7    of Police.    At the nation accreditation

8    standards.

9    Q.    And if I go to them they would have this

10    process there?

11    A.    Yes.

12    Q.    And this process, the test and other

13    provisions that you have in this Exhibit 13?

14    A.    Yes.

15    Q.    How many people took the exam?

16    A.    I believe right at 100.

17    Q.    And you hired four people off it?

18    A.    No.    We hired substantially more than

19    that.

20    Q.    How many people have you hired after the

21    exam?

22    A.    I would have to -- everybody, except the

23    last person that I hired, was hired off this.

24    Q.    And an approximation?

1        A.    Eight.

2        Q.    And did you go right down the list

3   numerically?

4        A.    Yes.

5        Q.    So was there anybody that was not

6   accepted?

7        A.    We basically went down the list, yes.

8   But we are not civil service, and there is the

9   rule of three.

10       Q.    Are you referring to a civil service

11   rule of three or what?

12       A.    No.

13       Q.    What's rule of three?

14       A.    Rule of three allows me, if I have one

15   position, to look at the first three

16   candidates -- and that's been supported by

17   court decisions left and right all over the

18   United States.

19       Q.    So have you gone right down the list, or

20   have you looked at the top three on each

21   occasion?

22       A.    I always look at the top three.  My

23   policy is, if I have a -- one opening, I would

24   call in the top three people and talk to them.

1    minimum.  In this particular case, Ms. Jones

2    never appeared at the site of the detail, or

3    the police Police Department at all, and did

4    not -- and made indications in her statements

5    that she had the inability to report at all,

6    and, in fact, the detail was not cancelled

7    until some 90 minutes to two hours after its

8    scheduled start time.  And she -- at that

9    point, had still not reported to the duty site

10    or the Police Department, nor had she been

11    excused by a supervisor from reporting to the

12    duty site or the Police Department.  And yet

13    she still put in for a four hour minimum

14    payment.

15    Q.  You agree, under the contract, police

16    officers are entitled to a four hour minimum

17    on a detail when it's cancelled shorter than

18    one and a half hours before the start of the

19    detail, correct?

20    A.  Yes.

21    Q.  So that if a detail was cancelled an

22    hour before, she would not have to appear and

23    still be entitled to the pay?

24    A.  Yes.



1    there was, then, some effort made to run Ms.

2    Jones through the process, I asked you then

3    what happened.

4       A.    What happened was that Officer Dinnan

5    was the field train -- at that point he was

6    the sole field training officer we had that

7    had been through the actual school.  There

8    were others that had done it, you know, but he

9    was the only one that had actually been

10   through the school.

11           So, therefore, we put Ms. Jones with

12   Officer Dinnan.  Officer Dinnan showed to be

13   not competent in the field training officer

14   program; and so, therefore, he was removed from

15   the field training officer program.

16           So, therefore, we had nobody else to

17   train Ms. Jones at that particular time.  A

18   staff meeting ensued after that, where we got

19   into the discussion of the cost benefit of

20   cruiser qualifying specials in general.

21           The discussion came about because,

22   under my regular regime, under my

23   administration, we do not use special officers

24   to fill patrol bases anymore.  We use regular

1    police officers whenever possible, with the

2    exception of the two or three still cruiser

3    qualified special police officers that we have

4    that will occasionally fill in when we can't

5    fill it any other way, including overtime.

6         So what amounted to -- when we

7    started talking about paying to have a special

8    cruiser qualified, when the only purpose of

9    that would be so they could use a vehicle at a

10   detail, it was not deemed to be cost effective

11   to spend ten weeks of training and ten weeks of

12   wages for them for a special officer to become

13   cruiser qualified.  It became a matter of

14   finances.

15   Q.  If you had the special cruiser

16   qualified, you would be able to use them if

17   they were on for a shift; isn't that correct?

18   A.   No.  As I said, I'm trying to minimize

19   that.  And I -- and in the process, I changed

20   three special officers positions to full-time

21   regular police officer positions and hired

22   four more regular full-time police officers so

23   my dependance on special officers is about

24   nil.

1   Q.   So only one has gone to the full-time

2   police academy is cruiser qualified?

3   A.   Yes.  With the exception of the ones

4   that were cruiser qualified prior to my

5   arrival.

6   Q.   Have they all been through the full-time

7   police academy?

8   A.   The special officers?

9   Q.   Yes?

10   A.   With the exception of Eddie Silva, no,

11   none of them have.  To my knowledge.

12   Q.   So where do you get the field training

13   officer manual where I would find the listed

14   requirements?

15   A.   Yes, in fact, very specifically it would

16   also give you the tests and also give you the

17   check off lists as to exactly what you need to

18   do in each section.

19   Q.   Was there any attempt to have Ms. Jones

20   become cruiser qualified?

21   A.   Right after I was here, there was -- it

22   was my understanding that Ms. Jones had made a

23   request to Lieutenant Gomes to become cruiser

24   qualified.  At that time Lieutenant Gomes was

1    and certain things needed to be done, I issued

2    what they called these directives.  These

3    directives were formulated, they were posted,

4    repetitively, to have input into them.  And

5    once the final product was done, it was

6    Xerox'd, and a copy was placed in everybody's

7    mailbox, including specials, dispatchers, and

8    even the civilian employees.  Everybody got

9    them.

10           Currently.  We have a department, a

11   new department manual, which, these are part

12   of.  They are part of the department manual

13   (indicating).  That was just issued recently.

14   Q.   So the details directive issued in April

15   of 2001, does that say about use of a cruiser

16   on details?

17   A.   There's definition in here.  One is

18   cruiser qualified.  And that is sub section E.

19   That section.

20           Let me get it right.  "Section 1,

21   subsection E, cruiser qualified special

22   officers are special officers -- cruiser

23   qualified special officers would have been

24   trained by the Harwich Police Department in the

1    proper operation of marked police vehicles, and

2    are recognized as having received sufficient

3    individual instruction and evaluation in the

4    field which allows that special officer to

5    function in a patrol vehicle without the direct

6    supervision of a regular officer."

7    Q.    Okay.  That's a definition of cruiser

8    qualified?

9    A.    That's the definition of cruiser

10    qualified.

11    Q.    Any other document that defines cruiser

12    qualified?

13    A.    There's another section in this policy

14    that refers to cruiser qualified and cruiser

15    details.

16    Q.    Just start with the definition of what

17    is cruiser qualified.  What you just read is a

18    definition of what is cruiser qualified?

19    A.    Yes.  Right.

20    Q.    Did you formulate that definition?

21    A.    Yes, I did.

22    Q.    What did you base that upon?

23    A.    Input from my staff.

24    Q.    Who?

1    A.    Lieutenant Gomes.    Lieutenant Mitchell.

2    The sergeants.

3    Q.    That is a document that you just read

4    which is currently in force?

5    A.    Yes, it is.

6    Q.    And has been continuously in force since

7    April of 2001?

8    A.    Yes, it has.

9    Q.    Is there any other document or written

10    definition of what is or constitutes cruiser

11    qualified?

12    A.    Yes.

13    Q.    What is that?

14    A.    Field training on and instruction

15    manual.    It's the San Jose field, field

16    training instruction program, which is what my

17    field training instructors are trained in.

18    And that calls for a ten week program at a

19    minimum for qualification.

20    Q.    Do you have a copy of that policy with

21    you?

22    A.    No.

23    Q.    Do you know when that was adopted?

24    A.    It was in the process of being adopted



1    counseling session.

2    Q.    Do you know why she was complaining that

3    too many vehicles were being stopped?

4    A.    Personally, no.

5    Q.    Professionally, as chief, and any other

6    fashion, do you know what the nature of the

7    complaint was?

8    A.    The nature of the complaint that was

9    portrayed to me, was that she did not want to

10    be bothered making all the computer entries.

11    Q.    Do you know whether she complained about

12    the nature of the stops that were being made?

13    A.    At the time, when I conversed with

14    Lieutenant Gagnon, or the lieutenant that was

15    involved in it, no, I did not.

16    Q.    Did you make any inquiries?

17    A.    No.

18    Q.    Did you ever learn that she was

19    concerned that these officers were making

20    inappropriate stops?

21    A.    The first that I heard of that, was

22    during the arbitration hearing.

23    Q.    Would it have been a violation of the

24    chain of command for Ms. Jones to come



# APPENDIX THREE

1      Q.    Now, with respect to your position as a

2      special police officer and some of the

3      administrative work that you claim you did,

4      were you a member of a bargaining unit?

5      A.    When I was part-time, no.

6           (Discussion off the record.)

7      Q.    You don't recall the income as you

8      stated earlier during that period, January 01

9      going forward, when you were in school?

10     A.    While I was part-time?

11     Q.    Yes.

12     A.    I don't recall specifically, no.  I

13     would have to look at pay stubs.

14     Q.    How frequently, for example, how

15     frequently during that period would you work

16     for the town?

17     A.    It would depended on the month.  In the

18     winter, obviously, it's slower.

19           In the summer it's a lot busier.

20     When there were details available, I would sign

21     up for everything I could.  But being at the

22     bottom of the list, a lot of times things

23     didn't get to me.

24           In the winter I didn't work,

1    A.    Lieutenant Gomes called me at home and

2    he asked me if I would be interested in a

3    full-time position with the police department.

4    Q.    And when did he call you; do you recall?

5    A.    Exactly, no.

6    Q.    Okay.

7    A.    I probably -- I probably have it written

8    down somewhere.

9    Q.    Okay.  What did he tell you?

10    A.    He asked if I would be interested in a

11    full time position.  And I immediately said

12    yes, because I thought he was referring to a

13    patrol position.

14         And then I said, "Wait a minute,

15    doing what?"

16         And he said dispatching.  And I said

17    no, that's not what I want to do.

18         And then we had a couple of -- more

19    phone conversations, to which he said, that if

20    I took the full-time position, I could consider

21    it a foot in the door for a patrol position.

22    So I agreed.

23    Q.    Though, at the time, in November of 2002

24    when Lieutenant Gomes made the statement you

1    paragraph.

2              (Witness reviews document.)

3    A.   Okay.

4    Q.   In reading that last paragraph, the

5    chief is describing an incident that occurred

6    previous to this?

7    A.   Yes.

8    Q.   Do you recall that incident?

9    A.   Yes.

10    Q.   Can you describe for me what that

11    incident was?

12    A.   This was the -- this was the detail I

13    was scheduled to work where we had a blizzard

14    the previous evening overnight.

15    Q.   And you are referring to February 18th

16    of 2003?

17    A.   I believe it was.  I'm thinking 16th,

18    but it may be the 18th.

19    Q.   Okay.  Now, describe for me, first of

20    all, what time was that detail scheduled to

21    begin?

22    A.   I believe it was scheduled to begin at

23    7:00 in the morning.

24    Q.   And can you describe for me what that

1      Q.   Why were you trying to get his

2    information?

3      A.   Because we had had such an excessive

4    amount of snow that -- and the state police

5    had informed me that they had been to the work

6    site and no one was there, that was it

7    apparent that they weren't going to be working

8    that day.

9      Q.   Okay.

10      A.   But they never physically called in and

11    cancelled in time.  So I was tracking to get

12    ahold of the foreman, to advise him that he

13    needed to call the police department and

14    advise them that he was canceling the detail,

15    because either someone neglected to note that

16    he called, or he forget.

17              I was just trying to get ahold of him

18     to get clarity on what was going on.

19      Q.   Did you have information that the detail

20    itself was cancelled?

21      A.    I did.  But I didn't have the -- I

22    didn't have the information that was needed

23    for me to not go.

24      Q.   Who gave you the information that the



1       A.    I spoke to Dispatcher Tavano and

2    Dispatcher Clough.

3       Q.    And so you were referring to Donna and

4    Amy?

5       A.    Correct.

6       Q.    And what time did you call the Harwich

7    police dispatch?

8       A.    Again, that's in my cell phone records

9    if I called from my cell phone, which I

10   probably did.  I don't recall exactly, because

11   I made -- I made several calls to them.  I

12   don't recall what time exactly they were.

13   Between 5:00 and 7:00.

14      Q.    And it was your cell phone the Harwich

15   police would have a recorded phone

16   conversation of?

17      A.    Right.

18      Q.    And why did you call Donna Tavano, what

19   did you call for that?

20      A.    I was calling to ask if they had

21   cancelled the detail and if they had forgotten

22   to call me and tell me.

23      Q.    From the standpoint of the Harwich

24   Police Department, was that detail cancelled

1    detail with?

2      A.    Yes.

3      Q.    And who was that?

4      A.    Ted Cronin.

5      Q.    What did when did you call Officer

6    Cronin.

7      A.    I called him either right before or at

8    the start time of the detail.  I have that in

9    the phone record.

10     Q.    Right before the start of the detail?

11     A.    I don't recall if it was -- it was in

12    the area of 7:00.  A little before, a little

13    after, I don't -- I have it in a cell phone

14    record.

15     Q.    So you talked to Officer Cronin just

16    before the start of the detail?

17     A.    Yes.

18     Q.    What did you advise Officer Cronin at

19    the start of the detail or just before the

20    start of the detail, excuse me.  I want you to

21    tell me what the phone -- what was the

22    conversation with Cronin like?

23     A.    I called and his wife answered.  She put

24    him on the phone.  He was sleeping.  And he

1    Q.   You only knew that the State Police

2    went, saw nobody there, and that's what they

3    reported to you?

4    A.   Right.  Yes.

5    Q.   And you were not told by the State

6    Police that this was cancelled?

7    A.   Right.

8    Q.   And you were not told by Harwich Police

9    that it was cancelled?

10    A.   Right.

11             (Discussion off the record.)

12    Q.   And with respect to the individual that

13    you spoke to at the State Police, do you

14    remember the person's name?

15    A.   I don't.

16    Q.   No?

17    A.   I didn't -- I didn't feel it was

18    necessary to write his name down at that

19    point.

20    Q.   Now, at that point you spoke with

21    Officer Cronin, and you are both, at that

22    point, I'm assuming, trying to figure out if

23    the detail has been cancelled; is that

24    correct?

1    A.    Correct.

2    Q.    And what did you say, Officer Cronin

3    went to the site?

4    A.    He told me he was going to take a ride

5    and he would call me right back.

6    Q.    And what did --

7    A.    Because he lives -- he lives in town, he

8    lived right down the street.  So he could --

9    he lives right down the street.  And he had a

10   pickup truck at the time.  I don't know if he

11   still does.  And he was going to take the ride

12   and call me, because he knew how far away I

13   was.

14              (Discussion off the record.)

15   Q.    Ms. Jones, I would ask you, do you know

16   a David Jasic?

17   A.    Yes.

18   Q.    Who is that.  He's a sergeant?

19   A.    For the Harwich Police Department.  Yes.

20   Q.    And on the morning of February 18th

21   2003, did you speak with Sergeant Jasic?

22   A.    Not directly, no.

23   Q.    Did somebody speak to him about the

24   situation with the detail, and do you know who



1   that was?

2       A.    Donna Tavano.

3       Q.    What did Donna speak with Sergeant Jasic

4   about?

5       A.    I think she just relayed to him that

6   there was a detail scheduled and they had not

7   called to cancel it, and what should I tell

8   her to do.

9       Q.    I would just show you a document, Ms.

10  Jones.  This is another certified transcript

11  of a -- of the Harwich 911 dispatch.  It's a

12  recorded line, and it's been transcribed and

13  certified.

14          And I just want you to review -- if

15  you look, it says at the top, "Dispatch:  Hi.

16  I'm waiting.  Dave went up.  For some strange

17  reason he thought that if they were going to be

18  there, they would be there an hour ahead.  Hold

19  on one minute."

20          And you said, "CJ:  Okay."

21      A.    Yes.

22      Q.    Do you recall having a conversation with

23  dispatch -- does that sound like a

24  conversation that you would have had with

1     this conversation.  What --

2              MR. VAN CAMPEN:  She is reading the

3     document.  I would --

4              MR. ROGAL:  A conversation that she

5     was not even part of?

6     A.   I interpret that that -- if I could get

7     down the roads, that I should try to.

8     Q.   Did you, at all, speak with Sergeant

9     Jasic that morning?

10    A.   Not that I recall directly.  I believe

11    he spoke with -- with Dispatcher Tavano, and

12    she relayed what he said.

13    Q.   Did you speak with any other supervisors

14    in the department?

15    A.   No.

16    Q.   Now, this snow storm that hit, it hit

17    the night before?

18    A.   The overnight, yeah.

19    Q.   Was it still snowing at that time?

20    A.   It might have been a little bit.  I

21    don't recall.  I don't recall exactly.

22    Q.   Okay.

23    A.   We weren't in the middle of the snow

24    storm, we had already gotten the dump.

1    say?

2       A.   I don't recall specifically what he

3    said.   I believe he said that they -- that

4    there was no one at the work site.

5       Q.   Okay.   That's what he told you?

6       A.   I believe so.

7       Q.   What else did he tell you?

8       A.   I think at some point he told me that I

9    should just say that I went.

10      Q.   What did you say to that?

11      A.   I don't recall.   I probably laughed it

12   off.

13      Q.   Do you recall ever speaking with Officer

14   Cronin on the 911 recorded line?

15      A.   911?

16      Q.   That morning, the police department's

17   recorded line?

18      A.   I don't recall specifically.

19      Q.   Now, other than the fact that he said

20   there's nobody there and he told you maybe you

21   should -- can you repeat what you said, maybe

22   you should put in for the -- don't show up or

23   something?

24               MR. ROGAL:   Objection.

1      A.    During this entire period, I was in the

2    process of shoveling myself out.   I don't

3    remember what time I stopped shoveling.

4      Q.    Now, after you shoveled yourself out,

5    you didn't report for the detail, correct?

6      A.    Correct.

7      Q.    What did you do for the remainder of

8    that day; do you recall?

9      A.    I don't recall.

10      Q.    You don't recall?

11      A.    What I did for the day, no.

12      Q.    Did you make it into Harwich at all?

13      A.    I don't believe I was scheduled to work

14    that day.

15      Q.    Okay.   Do you recall getting stuck in a

16    driveway in Harwich that day on Queen Anne?

17      A.    I recall getting stuck in -- in a drive,

18    but I don't know if it was that same day.   It

19    might have been.

20      Q.    But you don't recall?

21      A.    I don't recall if it was the same day.

22      Q.    Let me just show you another document.

23            Again, representing to you that this

24    is a certified transcript.

1    A.   I believe so.

2    Q.   And do you see at the bottom of

3    Northeast Construction, I think it says, Depot

4    Street overpass?

5    A.   Correct.

6    Q.   And does that refresh your memory as

7    what that detail was?

8    A.   Yes.

9    Q.   So it was a Depot Street overpass that

10   you were working for Northeast Construction?

11   A.   I believe so.

12   Q.   And this looks like a copy of the detail

13   that you would have -- this slip that you

14   would have submitted to be paid?

15   A.   Yes.

16           MR. VAN CAMPEN:  We can have that

17    marked.

18           (Exhibit 9 marked

19            for identification.)

20   Q.   Now, Ms. Jones, you testified that you

21   didn't report for that detail on February 18th

22   '03?

23   A.   Correct.

24   Q.   And that you learned that the detail had

1    but just review that for yourself.

2        A.    Okay.

3                (The witness complies.)

4        A.    Okay.

5        Q.    Now, just to review this document, does

6    this page, what you have read, does this

7    describe a conversation you had with Officer

8    Willis, or had with Officer Willis on April

9    15th of '03?

10        A.    It describes it.  But I don't agree that

11    it's exactly what was said and how it was

12    said.

13        Q.    Okay.  What do you recall from that

14    conversation?

15        A.    You want me to tell you what the

16    conversation was?

17        Q.    Tell me from your memory what the

18    conversation was.

19        A.    What the conversation was, was I called

20    the police department.  I spoke to Dispatcher

21    Willis.  I asked him if I could take a holiday

22    comp day, which you are allowed to do, as long

23    as the staffing is not at minimum.

24                He said he didn't know, because

1              Then Dispatcher Willis said, "No, no,

2      no."

3              Then under "CJ:  Could you put me out

4      for tonight."

5              Dispatch Willis asked, "Out sick?"

6              You said -- or excuse me, you said,

7      "Yeah, I don't care.  Whatever.  Whatever I can

8      do."

9      A.   Yes.

10     Q.   Do you dispute that that's what you said

11     during that phone conversation?

12     A.   I don't recall that part of the

13     conversation specifically.

14     Q.   So you don't recall originally asking

15     for sick time instead of holiday comp time?

16     A.   I don't know what I originally asked

17     for.

18     Q.   So then your testimony is it was holiday

19     comp time --

20     A.   From what I recall, I asked for holiday

21     comp time first.  And then I didn't know if I

22     could take holiday or sick.  But I knew I

23     couldn't work.

24             So I was trying to find out what I



1    me yet.

2    Q.   And after you spoke with Dispatcher

3    Tavano, what did you do, did you call the

4    State Police at that point?

5    A.   I believe I called the State Police at

6    that point.  Because I was scheduled to work

7    with two troopers as well.

8    Q.   What time did you begin digging your car

9    out of the drive?

10    A.   As soon as I woke up and looked out the

11    window.

12    Q.   Now, can you tell me, Ms. Jones, how

13    long it would take you to get from your drive

14    in Hyannis to that detail assignment in

15    Harwich on that morning?

16    A.   With snow?

17    Q.   With the snow.  What would your estimate

18    be?

19    A.   An hour.

20    Q.   An hour?

21    A.   I'm guessing.  My road had not even been

22    plowed at that point.

23    Q.   Did you at any time talk with the

24    officers who you were scheduled to work the

1    detail with?

2        A.    Yes.

3        Q.    And who was that?

4        A.    Ted Cronin.

5        Q.    What did when did you call Officer

6    Cronin.

7        A.    I called him either right before or at

8    the start time of the detail.  I have that in

9    the phone record.

10       Q.    Right before the start of the detail?

11       A.    I don't recall if it was -- it was in

12   the area of 7:00.  A little before, a little

13   after, I don't -- I have it in a cell phone

14   record.

15       Q.    So you talked to Officer Cronin just

16   before the start of the detail?

17       A.    Yes.

18       Q.    What did you advise Officer Cronin at

19   the start of the detail or just before the

20   start of the detail, excuse me.  I want you to

21   tell me what the phone -- what was the

22   conversation with Cronin like?

23       A.    I called and his wife answered.  She put

24   him on the phone.  He was sleeping.  And he

1       said, "Oh, I thought it is cancelled."

2                   And I said, "No, they never called."

3                   And he was, like, "Oh, oh, okay.

4       Well, I will take a ride down and, and see what

5       the situation was."

6                   And he -- I said, "Okay, call me

7       right back as soon as you find out."

8                   He was going to take a ride, I

9       believe, to the detail site, to see if they

10      were there.  Which I knew they weren't, because

11      I already talked to the State Police.

12      Q.   But if the State Police told you it was

13      cancelled before you --

14      A.   They didn't tell me it was cancelled.

15      They told me that there was no one there.

16      That they had driven by.

17      Q.   I want to clarify.  You testified that

18      it was cancelled, and you found that out from

19      the State Police?

20      A.   Okay, it was --

21                  MR. ROGAL:  Note my objection.   I

22      think that was -- that's a mischaracterization

23      on both sides, but why don't you just --

24      A.   It was not cancelled by someone running

1              At one point Lieutenant Gagnon was in

2     charge of patrol, I believe.  And then it

3     switched to Lieutenant Mitchell.  And I know

4     Captain Welsh was in charge of patrol.  And

5     then Lieutenant Gomes has been in charge.  It's

6     been -- it switches hands, so I don't recall

7     that year who was in charge.

8        Q.   Now, in the fall of 2001, what were you

9     doing during that period of time?

10       A.   School and Harwich Police Department.

11       Q.   And would your assignment as a special

12    police officer, would they slow down during

13    that period?

14       A.   Not necessarily.  In the fall, because a

15    lot of contractors are still out working, if

16    there's not snow on the ground, then they will

17    work.  Obviously some contractors -- tree work

18    and stuff, would be done more during the

19    summer.

20       Q.   And getting past the fall of 2001 and

21    coming into January of '02, what were you

22    doing during that period?

23       A.   In January -- same answer.  I was going

24    to school.  I was working for the Harwich

1    during your time there?

2        A.    Basically started out as a waitress.

3    Eventually, I became the dining room manager.

4    I was there, I believe, for seven and a half

5    years.

6        Q.    Seven and a half years?

7        A.    I believe so, yeah.

8        Q.    And how large is that business, do you

9    know?

10        A.    How large as in --

11        Q.    Not how big is the building, but in

12    terms of generating revenue, do you know what

13    it generates?

14        A.    I have absolutely no idea.  I know it's

15    a business to the point where they have lines

16    out the door in the summer until the time they

17    close.

18        Q.    And you stated that you were the kitchen

19    manager?

20        A.    Dining room.

21        Q.    Dining room.  Okay.  And who was your

22    immediate supervisor there?

23        A.    Gerald Ott.

24        Q.    Okay.  And in 1995, May of 1995, you

1      Telecommuincator Training Course- APCO

2      Institute, South Daytona, Florida, can you

3      describe that for me?

4          A.    That's where their main branch office is

5      located.   That's the address.   That's the

6      address they give.   So that the

7      telecommunications -- they, APCO, I had to do

8      a APCO training seminar to be certified to

9      dispatch.

10         Q.    Okay.   But the training itself did not

11     occur in Florida, did it?

12         A.    No.

13         Q.    Where did the training occur?

14         A.    That's just where they are located.

15         Q.    Where did the training occur?

16         A.    I have been to so many trainings, I

17     don't remember who does what where.

18              I believe it's -- it was somewhere on

19     the Cape.   I don't remember specifically where

20     I went for the training.

21         Q.    Now, was that required training, or was

22     that voluntary?

23         A.    To be honest with you, they have

24     changed.   And I don't know that it was

1    required at the time that I started.

2         I know that now it has become

3    required to dispatch, that you need this

4    training.  But I don't recall if when I

5    started, if it was required.

6         It was just something that they sent

7    you to, to get you familiar.

8    Q.   But presently it's a pre-requisite to

9    becoming a dispatcher?

10   A.   I believe it is.

11   Q.   And Telecommunicator E911 training

12   course, APCO Institute, South Daytona,

13   Florida?

14   A.   Again, that was -- that was not in

15   Daytona, Florida, that's where their main

16   office is, their address is, but that's a

17   separate training course for 911 calls,

18   basically.

19   Q.   You also list Public Safety

20   Telecommunicator's Training Seminar two years

21   attendance?

22   A.   Yes.

23   Q.   Barnstable County Sheriff?

24   A.   Yes.



1    by the Sandwich Police Department presently?

2    A.    That's correct.

3              MR. ROGAL:    Objection.

4    Q.    Now, moving down the list, the Chatham

5    Police Department, you list your dates of

6    employment there from July of 1998 to June of

7    1999; can you tell me what capacity you were

8    employed by the Chatham Police Department

9    during that time?

10    A.    Dispatcher.

11    Q.    And were you full-time?

12    A.    Yes.

13    Q.    And can you describe for me what your

14    duties were as a Chatham police dispatcher?

15    A.    Dispatching police officers calls to

16    calls -- taking in-coming calls, filling out

17    detail requests.    That's basically it.

18    Q.    Okay.    And your immediate supervisor was

19    Lieutenant Michael Walker?

20    A.    Correct.

21    Q.    And do you recall your income?

22    A.    I don't.

23    Q.    Why did you leave the Chatham Police

24    Department in June of 1999?

1    A.    Yes.

2    Q.    And the statement, "fluffy," do you

3    recall making that statement?

4    A.    Yes.

5    Q.    Why would you make that statement?

6    A.    That's what I call him.

7    Q.    That's what you call Officer Willis?

8    A.    Yes.

9    Q.    I would give you some time, Ms. Jones,

10   to review this transcript, if you will.

11        Do you recall this to be a

12   conversation that you had with Dispatcher

13   Willis on April 15th 2003?

14        MR. ROGAL:    Objection.

15   Q.    You can answer that.

16   A.    I recall that I had a conversation with

17   Dispatcher Willis.  I have scanned this, and I

18   don't agree that this is exactly what I said.

19   Q.    Okay.  Let me take you to page 5 of this

20   document.  I ask you to read page 5.

21   A.    Starting?

22   Q.    Starting with Dispatcher Willis.

23   A.    "No, Kender takes -- no, Kender --

24   Q.    You don't have to read that out loud,

1    but just review that for yourself.

2    A.   Okay.

3              (The witness complies.)

4    A.   Okay.

5    Q.   Now, just to review this document, does

6    this page, what you have read, does this

7    describe a conversation you had with Officer

8    Willis, or had with Officer Willis on April

9    15th of '03?

10    A.   It describes it.  But I don't agree that

11    it's exactly what was said and how it was

12    said.

13    Q.   Okay.  What do you recall from that

14    conversation?

15    A.   You want me to tell you what the

16    conversation was?

17    Q.   Tell me from your memory what the

18    conversation was.

19    A.   What the conversation was, was I called

20    the police department.  I spoke to Dispatcher

21    Willis.  I asked him if I could take a holiday

22    comp day, which you are allowed to do, as long

23    as the staffing is not at minimum.

24              He said he didn't know, because

1    Sergeant Kender had the book out back.  He

2    asked if he wanted to speak to Sergeant Kender,

3    I said no.  I then said, if you see the book,

4    if it's possible for me to take a holiday comp,

5    I will take a holiday comp, but if I can't, you

6    can put me out sick.  Because I was -- I was

7    physically unfit for duty.  So it didn't matter

8    what I used.  I just couldn't work.

9            Of course they don't want you to use

10   sick time.  You get a bonus for not using all

11   your sick time.  So I was trying to avoid

12   taking the sick time.

13   Q.   Okay.  So you originally requested

14   holiday comp time?

15   A.   Yes.

16   Q.   Can I just refer to you page 5 of this

17   document.

18   A.   Yes.

19   Q.   Excuse me, I would actually like to

20   refer you, before I do that, to page 3.

21   A.   Okay.

22   Q.   If you see under where it says, "CJ:  I

23   thought you said hang on."

24            "Yes."

# APPENDIX FOUR

1      A.    Yes.

2      Q.    And how did he revamp the unit; can you

3    explain that to me?

4      A.    He set up an application process.    They

5    did interviews.    And once they determined who

6    was on it, he sent a -- actually, he brought

7    someone in to do special training.

8      Q.    Who did he bring in; do you recall?

9      A.    International Police Mountain Bike

10   Association.

11     Q.    They trained all the officers that were

12   selected for the bike patrol unit?

13     A.    Yes.

14     Q.    And how many special police officers

15   were selected by Chief Mason for the bike

16   patrol unit; if you recall?

17     A.    For that unit, none.    It was only opened

18   at that point to full-time members.

19     Q.    And when you say at that point, is it

20   still only open to full-time, regular police

21   officers?

22     A.    Yes.

23     Q.    Now, Mr. Hutton, you have subsequently

24   decertified from IBPO, or the union has?

1    happened?

2        A.    We didn't have one.

3        Q.    Okay.  So the position was vacant?

4        A.    Yes.

5        Q.    And during what period of time was it

6    that that position was vacant?

7        A.    The same time that she got rehired.  I'm

8    not so good with dates.

9        Q.    Okay.  That's understandable.

10       A.    The same time she was reappointed, we

11   had an opening.

12       Q.    Okay.  Who was the former union

13   secretary?

14       A.    It was either Terry Dinnan.

15       Q.    Yes.

16       A.    Or Rob Horgan.

17       Q.    Rob Horgan?

18       A.    Yes.

19       Q.    Both of these individuals are patrolmen?

20       A.    Yes.

21       Q.    And do you recall when either of these

22   individuals would have vacated the position of

23   union secretary?

24       A.    It was during our contract negotiations,

1    have been Mr. Wilis.

2       Q.   Mr. Willis?

3       A.   Yes.

4       Q.   Dispatcher Willis?

5       A.   Yes.

6       Q.   And what was discussed; if you recall?

7       A.   Whether or not we would have her be the

8    secretary.

9       Q.   Okay.  What else was discussed?

10      A.   Someone brought up the, whether or not

11   she could hold the position.

12      Q.   And what would prohibit Ms. Jones from

13   holding the position of union secretary?

14      A.   Probationary status.

15      Q.   Do you recall who brought that issue up?

16      A.   I do not.

17      Q.   Was there any discussion about that

18   issue?

19      A.   Yes.

20      Q.   Can you describe that discussion for me?

21      A.   I can't describe it.  I don't know what

22   was said.  I know the outcome of the

23   discussion.

24      Q.   Okay.  What was the outcome?

A.   That she wasn't on probation, so she could hold the position.

Q.   How was that outcome reached?

A.   Just through discussions within the union members.

Q.   Did you consult with Mr. McArdle on that issue during that meeting?

A.   No.

Q.   Did he attend that meeting?

A.   No.

Q.   Did you ask the administration, the chief or lieutenant, what her status was?

A.   No.

Q.   Did anyone during that meeting express their belief that she was on probation?

A.   No.  Just the question was raised whether or not she was.

Q.   Do you recall if Detective Brakett attended that meeting?

A.   Yes.

Q.   Do you recall if he raised the issue of her being on probation?

A.   I do not.

Q.   How about Officer Ted Cronin, did he



1    raise the issue of probation at that meeting?

2    A.   I don't recall.

3    Q.   At some point the outcome was that the

4    union membership determined that she was not

5    on probation, and that she was entitled to

6    hold the position of union secretary?

7    A.   Yes.

8    Q.   And was she elected at the same meeting?

9    A.   Yes.

10    Q.   Do you recall if that vote was

11    unanimous?

12    A.   I do not.

13    Q.   You don't recall?

14    A.   I do not recall.

15    Q.   Would there be a record of that vote?

16    A.   Probably not.

17    Q.   Why not?

18    A.   Because we did not have a secretary at

19    that time.

20    Q.   Okay.  So there would be no minutes of

21    that meeting?

22    A.   No. Our union meetings are very casual.

23    Q.   Mr. Hutton, how often does -- or would

24    Mr. McArdle have attended union meetings?

1    A.    Rarely.

2    Q.    Do you recall meetings at which Mr.

3    McArdle was in attendance?

4    A.    He was at some.  I couldn't tell you

5    when they were.

6    Q.    Okay.

7    A.    Or why he was there, but he did attend

8    some of them.

9    Q.    And during the meeting at which Ms.

10   Jones was elected union secretary, what

11   position did you hold?

12   A.    Vice-president.

13   Q.    Who was the president of the union at

14   the time?

15   A.    Dispatcher Willis.

16   Q.    Now, Mr. Hutton, once Ms. Jones was

17   elected union secretary, did she also become a

18   part of the negotiating team for the union?

19   A.    Yes.

20   Q.    She did?

21   A.    Yes.

22   Q.    Did she attend any negotiating sessions

23   with the town; if you recall?

24   A.    Yes.





1    sergeants, they had separated the union and

2    they were -- there were issues between the two

3    unions regarding overtime, time off, and --

4    Q.    What was the ongoing issue?

5    A.    How overtime was to be filled throughout

6    the department.

7    Q.    Who was the issue being dealt with by,

8    who was dealing with that issue?

9    A.    Lieutenant Mitchell, I believe, and

10    Chief Mason.

11    Q.    How many meetings were held between the

12    union and those gentleman on that issue?

13    A.    A couple.

14    Q.    And do you recall who was in attendance

15    at that meetings for the union?

16    A.    Again, to the best of my knowledge, it

17    would have been the union board.

18    Q.    Okay.  And during the meetings on that

19    overtime issue, did you, perhaps, cite for me

20    examples of when Ms. Jones was critical of the

21    administration?

22    A.    I couldn't cite specific examples.  We

23    -- we all voiced our opinions on how we

24    thought the situation would be handled, was

# APPENDIX FIVE

1    thing and the administration wants another,

2    and it's a debate until there's a resolution.

3        Q.   But on this overtime issue, do you

4    recall specifically what you may have said as

5    part of these discussions?

6        A.   Not specifically, no.

7        Q.   Did the discussions themselves ever turn

8    into arguments between the parties; if you

9    recall?

10       A.   They got heated on occasion.  I don't

11   remember which meetings and what issues were

12   at hand, because we met about a variety of

13   issues.

14       Q.   When they got heated, would any

15   particular member of the union start speaking

16   out more frequently or how would that work,

17   when the discussions got heated?

18       A.   Well, everybody has a different

19   personality.  Some people get more vocal.

20   Some people would fly off the handle and say

21   things that -- that weren't pertinent.  There

22   was not -- it wasn't screaming, yelling and

23   disrespect.

24       Q.   Well, how would you -- when things got

1    other members, who, I think, still wear the

2    flag.

3    Q.    When you say "the flag," what you are

4    referring to?

5    A.    We had a patch and a flag.  And he

6    changed that to patch patch.  And I was very

7    upset about that.

8    Q.    Patch and the American flag?

9    A.    Yes.

10    Q.    Okay.

11    A.    And then I was suddenly taken off bike

12    patrol, when he had other special police

13    officers driving cruisers, and I wasn't -- I

14    suddenly wasn't allowed to ride a bike

15    anymore.

16    Q.    When did you raise the issue of the

17    flag?

18    A.    I didn't raise it directly to him.  I

19    was vocal -- I was very vocal about that.  I

20    was very upset by it.

21    Q.    Who were you vocal to?

22    A.    Other members of the department.

23    Q.    Such as?

24    A.    Probably everyone has heard at some

1    point.

2        Q.    When you say members of the department,

3    do you mean members of the union, or are you

4    referring to the police administration, the

5    lieutenants, sergeants?

6        A.    Union members.  I don't know if I ever

7    said anything to administration.  They might

8    have -- they might have heard me say something

9    or heard that I said something.

10       Q.    Do you recall which union members you

11    would have shared that with, and that

12    criticism?



13       A.    Not specifically no.  No.

14       Q.    How about with respect to the bike

15    patrol issue, who you were vocally, at least

16    expressing that to?

17       A.    Again, I was vocal to everyone about

18    that.  It was another issue I was very upset

19    about and I thought was unfair.

20       Q.    Did you ever bring that to Chief Mason?

21       A.    Not directly.

22       Q.    When you say not directly, who did you

23    bring it to?

24       A.    I believe -- I don't remember who was

1        A.    I don't remember at that time if I did

2    or did not.   Probably not.   Because I think it

3    was still Captain Welsh and Lieutenant Gomes

4    in charge when I got taken off.

5        Q.    Did you complain to Captain Welsh or

6    Lieutenant Gomes?

7        A.    I might have.   I might have complained

8    to Captain Welsh.   But I don't remember if I

9    specifically did or did not.

10        Q.    Okay.

11        A.    That was years ago.

12        Q.    So you don't recall if you would have

13    complained to Captain Welsh, if you did?

14        A.    Right.

15        Q.    But it would have been some point during

16    this whole issue where the bike patrol became

17    an issue for you?

18        A.    Right.

19        Q.    And how about Lieutenant Mitchell, did

20    you ever complain to Lieutenant Mitchell about

21    that issue?

22        A.    No.   He wasn't a lieutenant at that

23    point.

24        Q.    Did you ever complain to any of the

# APPENDIX SIX

1    answer.  I would object to the form.  I'm

2    objecting to the form of the question.

3    A.   For the most part.  He was not

4    designated, but we allowed him to conduct the

5    negotiations.

6            Now, certainly, if there were

7    questions that one of the members had, they

8    were not obligated to ask the question.  They

9    could ask the questions themselves.

10   Q.   Mr. Willis, is it fair to say, then,

11   that Mr. McArdle did most of the talking at

12   those meetings?

13   A.   That would be fair to say.

14   Q.   Ms. Jones has stated that she was vocal

15   and outspoken with the chief; do you have any

16   specific examples of when Ms. Jones was vocal

17   and outspoken with the chief of police?

18   A.   Not personally, no.

19   Q.   Mr. Willis, do you know what the process

20   is for someone to become a regular, full-time

21   police officer for the town?

22   A.   I do.

23   Q.   What is that process?

24   A.   Well, it varies.  If someone wants to

1    that I had, the accuracy I can not swear to.

2              I don't know if that's completely

3    accurate or not.

4    Q.   Do you remember Ms. Jones initially

5    calling to request the use of a holiday?

6    A.   I remember her calling and asking about

7    taking some time off.

8    Q.   Okay.

9    A.   And asking about the book.

10   Q.   Okay.   What is the book?

11   A.   That's the schedule that I was telling

12   you, it's a year long, which is maintained by

13   the sergeants.   It had been maintained in

14   dispatch, but at this point in time, it was

15   out of dispatch in the roll call room, that's

16   where it was to be kept.

17             I recall telling her that I didn't

18   have the book, Sergeant Kender probably had the

19   book.   And if she wanted to speak to him, I

20   could put her through to him.

21             And I recall her saying to put her

22   out sick.   And I said okay.

23   Q.   Now, let me just show you here, Mr.

24   Willis, you see it says, "CJ:   Can I -- can I

1   to see it, and you can, and before anybody

2   knows anything, you can give me a holiday if

3   it will work.  And if it's too of a pain, put

4   me out sick, I don't care."

5          And then it says, "Dispatcher Willis:

6   All right."

7          Do you recall that type of a

8   conversation with Ms. Jones?

9          MR. ROGAL:  Objection.

10  Q.   You can answer.

11  A.   I don't.  I don't remember word for

12  word.  Because, like I said, the conversation,

13  basically was, I'm not going -- I believe it's

14  in here, I'm not going to get involved, no

15  matter, whatever.  If you want, need to talk

16  to Kender, talk to Kender.  If you want me to

17  put you out sick, okay I would put you out

18  sick.

19  Q.   Do you recall Ms. Jones saying that if

20  you saw the book before anyone else, to make

21  the change that she requests here?

22  A.   I don't.

23  Q.   And at some point after this phone

24  conversation with Ms. Jones she was

1      A.   No.

2      Q.   And do you know if Ms. Jones was

3  disciplined for this?

4      A.   I don't.

5      Q.   At some point, Mr. Willis, Ms. Jones was

6  terminated?

7      A.   It's my understanding, yes.

8      Q.   And do you know why she was terminated?

9      A.   I do not.

10      Q.   Do you know when she was terminated?

11      A.   No.

12      Q.   Do you recall after she was terminated

13  if the Town of Harwich filled her position?

14      A.   Yes, they did.

15      Q.   And do you recall who they filled it

16  with?

17      A.   Patty McDonald.

18      Q.   Patty McDonald?

19      A.   Yes.

20      Q.   Is Patty McDonald a female?

21      A.   Yes.

22      Q.   Mr. Willis, have you ever utilized 111F

23  benefits with the Harwich Police Department?

24      A.   No.

1          A.    No.

2          Q.    And do you know if Ms. Jones was

3    disciplined for this?

4          A.    I don't.

5          Q.    At some point, Mr. Willis, Ms. Jones was

6    terminated?

7          A.    It's my understanding, yes.

8          Q.    And do you know why she was terminated?

9          A.    I do not.

10         Q.    Do you know when she was terminated?

11         A.    No.

12         Q.    Do you recall after she was terminated

13   if the Town of Harwich filled her position?

14         A.    Yes, they did.

15         Q.    And do you recall who they filled it

16   with?

17         A.    Patty McDonald.

18         Q.    Patty McDonald?

19         A.    Yes.

20         Q.    Is Patty McDonald a female?

21         A.    Yes.

22         Q.    Mr. Willis, have you ever utilized 111F

23   benefits with the Harwich Police Department?

24         A.    No.

# APPENDIX SEVEN

30

```
 1        qualified or that she wasn't allowed to drive a

 2        police cruiser?

 3   A.   I don't remember.  I can't say one way or the other.

 4   Q.   Do you recall if the Local Union, the Board members,

 5        ever expressed to you a concern that Miss Jones and

 6        other special police officers were not allowed to

 7        drive police cruisers?

 8   A.   I don't remember.

 9   Q.   Mr. McArdle, I want to direct your attention to an

10        incident that occurred on February 18th of 2003, and

11        that involved a detail that Miss Jones was scheduled

12        to work in the Town of Harwich that day and there was

13        a snowstorm that day.  Do you recall that incident?

14   A.   Yes.

15   Q.   Do you recall that Miss Jones put in a detail slip

16        for four hours?

17   A.   Yup.

18   Q.   Do you recall as a result of that a meeting with the

19        Chief of Police?

20   A.   Yes, I do.

21   Q.   Can you explain to me why it is that you had that

22        meeting with the Chief of Police?

23   A.   The meeting was called, I believe by myself.  I think

24        we filed a grievance, I believe.  Off the top of my
```



DUNN & GOUDREAU

# APPENDIX EIGHT



1         and I believe it was April 15th of 2003.

2         Ms. Jones was at the range to qualify, is

3         that correct?

4   A.    Yes.

5   Q.    All right.  And do you know how long she

6         was there?

7   A.    I believe it was an all-day session, a

8         pretty much all-day session.

9   Q.    And it would be fair to say she was

10        shooting her weapon most of that day?

11  A.    No, it would not.

12  Q.    What would you say?

13  A.    In fact, when I conducted my investigation

14        and spoke with Sergeant Sullivan and

15        Officer Porter, the firearms instructors,

16        and Sergeant Kendrick who was there as a

17        participant, their comment was she spent

18        most of the day sitting in her car

19        bitching about how hot it was and how she

20        didn't want to be there and just generally

21        was completely negative, kept, you know,

22        was complaining about the fact that she

23        had to stay all day, couldn't you let me

24        go, and that she took repeated breaks to

A.   When I called her at home to tell her that
     I was investigating her for the sick leave
     issue, hung up, approximately an hour
     later she called back and said, Okay, this
     is what is really going on, I wasn't
     really sick, I hurt myself at the range, I
     didn't want to tell anybody, I didn't want
     anybody to think I was a cry baby so I
     didn't do anything.  I said, Well, you are
     aware of the procedure, you know you are
     supposed to.  Yes, I know I am, I didn't
     do it, I know I totally failed to do what
     I was supposed to do.  I said, Okay, I
     said, Well, are you claiming that you are
     injured now?  And she said yes, I am.  And
     I said, Then you need to go see Doctor
     Miner and be examined.  And she assured me
     that she would.  The next day she met me
     at the station with a note of some sort
     from the Cape Cod Hospital emergency room
     saying that she had a swollen hand.  And I
     said, That's nice, that is not what I
     asked you to do, I told you to go see
     Doctor Miner, so make an appointment and



# APPENDIX NINE

# LAW OFFICES OF TIMOTHY M. BURKE

NEEDHAM CORPORATE CENTER
160 Gould Street, Suite 111
Needham, Massachusetts 02494-2300
(781) 455-0707
Facsimile (781) 455-8879

*Timothy M. Burke*
*Joseph P. Kittredge*
*Sheila E. McCravy*
*Scott W. Dunlap*
*Suzanne T. Caravaggio*

<u>*Of Counsel*</u>
*Brian J. Rogal*
*Joseph G. Donnellan*

November 7, 2003
VIA CERTIFIED MAIL



RECEIVED
NOV 12 2003
COMMISSION AGAINST
DISCRIMINATION

Massachusetts Commission Against Discrimination
One Ashburton Place
Room 601
Boston, MA 02108

RE:  <u>*Carolyn Jones v. Town of Harwich, et al*</u>

Dear Sir or Madam:

Enclosed please find for filing the Complaint and Jury Demand, Charge of Discrimination and Motion for Leave to File in Superior Court in the above-referenced matter.

Thank you for your attention to this matter.

Very truly yours,

Brian Rogal

BR/krd
Enclosures

CERTIFIED MAIL NO. 7002 1000 0005 2708 7564

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

ENTER CHARGE NUMBER
- [ ] FEPA –
- [ ] EEOC

| Massachusetts Commission Against Discrimination | and EEOC |
|---|---|
| (State or local Agency, If any) | |

**NAME** (Indicate Mr., Ms., or Mrs.)
Carolyn E. Jones

**HOME TELEPHONE NO.** (Include Area Code)
(508) 778-1413

**STREET ADDRESS** — **CITY, STATE AND ZIP CODE**
28 Harrington Way, Hyannis, MA 02601

**COUNTY**
Barnstable

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** (If more than one list below.)

| **NAME** William A. Mason | **NO. OF EMPLOYEES/MEMBERS** 50+ | **TELEPHONE NUMBER** (Include Area Code) (508) 430-7542 |
|---|---|---|

**STREET ADDRESS** — **CITY, STATE AND ZIP CODE**
Harwich Police Department, 183 Sisson Road, Harwich, MA 02645

**NAME**
Town of Harwich

**TELEPHONE NUMBER** (Include Area Code)

**STREET ADDRESS** — **CITY, STATE AND ZIP CODE**
732 Main Street, Harwich, MA 02645

**CAUSE OF DISCRIMINATION BASED ON** (Check appropriate box(es)):
- [ ] RACE
- [ ] COLOR
- [X] SEX
- [ ] RELIGION
- [ ] NATIONAL ORIGIN
- [ ] AGE
- [X] RETALIATION
- [ ] OTHER (Specify)

**DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE** (Month, day, year)

**THE PARTICULARS ARE** (If additional space is needed, attached extra sheet(s)):

See Attached

> RECEIVED
> NOV 12 2003
> COMMISSION AGAINST DISCRIMINATION

[ ] I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Date **Nov 1, 2003**  Charging Party (Signature)

NOTARY – (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)
Nov 1, 2003

EOC FORM 5  PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE

## MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

CAROLYN E. JONES,                        )
       Complainant              )
                                )
VS                                        )
                                )
WILLIAM A. MASON,                         )
CHIEF OF POLICE,                          )
HARWICH POLICE DEPARTMENT,                )
TOWN OF HARWICH,                          )
       Respondent               )

RECEIVED
NOV 1 2 2003

---

## MOTION FOR LEAVE TO FILE IN SUPERIOR COURT

---

Complainant moves for leave to file this case in Superior Court without waiting 90 days. Complainant will file after 90 days if this motion is not allowed.

                        Respectfully submitted
                        By Complainant's Attorney,

                       LAW OFFICES OF TIMOTHY M. BURKE

                       Brian Rogal, Esq., BBO #424920
                       160 Gould Street, Suite 111
                       Needham, MA 02494
                       (781) 455-0707

# MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

CAROLYN E. JONES,  )
      Complainant  )
   )
VS  )
   )
   )
WILLIAM A. MASON,  )
CHIEF OF POLICE,  )
HARWICH POLICE DEPARTMENT,  )
TOWN OF HARWICH,  )
      Respondent  )

NOV 1 2 2003

---

## COMPLAINT AND JURY DEMAND

---

### PARTIES

1. Complainant Carolyn E. Jones is a resident of the Town of Hyannis, Massachusetts.

2. Respondent William A. Mason is the Chief of Police for the Town of Harwich. He is being sued in his official and individual capacities.

3. Respondent Town of Harwich was the Complainant's employer.

### FACTUAL ALLEGATIONS

4. On July 1, 1999 Ms. Jones was hired by the Town of Harwich to be a full time civilian dispatcher for its police department. She was also hired by the Town to be a special police officer.

5. Ms. Jones' career goal is to be a full time police officer. She went to a police academy for special police officers, and applied with Harwich for a full time position as a police officer.

6. Both dispatching and special police officer positions are generally considered helpful to obtaining a position as a full time police officer. Towns commonly hire police officers from the ranks of dispatchers and special police officers because they are familiar with them, had the chance to evaluate them and because those individuals know the town.

7. Harwich currently has a force of approximately 35 police officers. There is only one woman on that force. In recent years there have never been more than two female police officers. When Harwich does hire a female police officer they wind up leaving the department.

8. During the time she was employed as a special police officer Ms. Jones received evaluations which constantly included ratings of excellent and outstanding.

9. In January, 2001 Ms. Jones resigned as a dispatcher in order to further her education. She maintained her position as a special police officer, her primary interest. She also worked as the animal control officer for Harwich during the summers.

10. On or about November, 2002 Harwich police Lt. Gagnon asked Ms. Jones to come back as a full time dispatcher. She was not interested in that position, but Lt. Gagnon told her that it would be a foot in the door for a full time position. She accepted the dispatch position based upon the representation that it would help her become a full time police officer.

11. Since that time Harwich has hired four male police officers. None of them have prior experience as full time police officers.

12. Ms. Jones became active in the police union. In that position she was critical of the police chief and the police administration. She also complained about not being hired as a full time officer.

13. On or about April 15, 2003 Complainant was ordered and did participate in mandatory firearms qualification at the firing range. Complainant was on duty at the time that she qualified at the range.

14. While shooting her firearm at this mandatory training, Complainant injured her shooting hand between the thumb and forefinger. Complainant did not report the injury at this time.

15. With the use of sick leave and scheduled time off, Complainant believed that the injury would resolve itself without missing an extensive amount of time from work.

16. On or about April 23, 2003 Complainant was advised that she was being investigated by the Department for abuse of sick leave. Complainant had not used sick leave in the six (6) months prior to her injury at the range. At this time, Complainant reported her injury to Lt. Barry Mitchell of the Harwich Police Department.

17. Complainant was instructed to see the town doctor, Dr. Scott Miner who determined that she was physically unfit to work due to her hand injury. Dr. Miner also stated that her injury resulted from firing her weapon. (See attached Exhibit A).

18. At the time of the injury, there was in effect a rule of law that if a police officer was injured while on duty the officer was entitled to full pay during the period of disability.

19. The provisions of M.G.L. c. 41 §111F as amended apply to the Town of Harwich.

20. On or about April 30, 2003, Complainant submitted to Respondent Chief Mason her request for job injury benefits pursuant to M.G.L. c. 41 §111F.

21. On or about May 7, 2003, Respondent Chief Mason denied the Complainant benefits pursuant to M.G.L. c.41 §111F citing her failure to timely file a written report of the injury as required in the collective bargaining agreement. (See attached Exhibit B)

22. The provisions of the collective bargaining agreement cited by the Respondent Chief Mason do not state that the timely filing of a written report is a precondition to receiving §111F benefits. (See attached Exhibit C)

23. On May 16, 2003, after exhausting her accumulated sick leave, the Complainant had to petition to the Sick Bank Board for sick days to carry her through until she was cleared to return to work. Ms. Jones anticipated that would occur the first week of June 2003. (See attached Exhibit D).

24. On or about June 6, 2003, Dr. Miner cleared the Complainant to work under a voluntary light duty status as provided by the collective bargaining agreement. Respondent Chief Mason refused to permit Complainant to return to work in that status.

25. On June 8, 2003 Complainant was once again required to petition the Sick Bank Board for additional sick days to carry her through until she could see a hand surgeon on June 20, 2003. (See Attached Exhibit E) The Respondent Chief had ordered her to be examined by the hand surgeon.

26. The Respondents' actions constitute a violation of M. G. L. c. 41 §111F and a breach of the Complainant's contractual rights as established by the current collective bargaining agreement.

27. In or about June 2003 Ms. Jones was told that she could not drive a police cruiser by herself because she was not "cruiser qualified". Male officers with less experience were deemed "cruiser qualified" and allowed to operate a cruiser by themselves. The

Town never has had any policy regarding "cruiser qualification", does not offer any special training in the operation of police cruisers, and has not applied any such qualification to male officers.

28. On June 10, 2003 the Town of Harwich fired Ms. Jones. It cited an alleged abuse of sick leave and an alleged issue with payment for a detail.

29. Ms. Jones' use of sick leave has not been excessive. The injury to her hand was documented by the physician selected by the Town. The Town has taken no action against male police officers with injuries nor has it taken any action against male police officers who have used far more sick leave.

30. The issue regarding detail pay involves a detail that was cancelled with notice shorter than that permitted by contract. Pursuant to that contract Ms. Jones, and any other police officer, is entitled to a minimum of four hours pay for a detail that is cancelled at the last minute. No male has been disciplined in any similar situation.

31. The actions of the Respondents constitute an on going pattern of desperate treatment and discrimination against Ms. Jones based upon her gender.

## First Cause of Action

32. Complainant realleges and incorporates herein paragraphs one through thirty above.

33. Respondent's actions constitute discrimination in employment based upon the gender of Ms. Jones in violation of M.G.L. c. 151B.

## Second Cause of Action

34. Complainant realleges and incorporates herein paragraphs one through thirty three above.

35. Respondent William Mason has aided and abetted the Town of Harwich's sexual discrimination, thereby violating the provisions of M.G.L. c. 151B.

## JURY DEMAND

Complainant demands trial by jury on all issues

WHEREFORE, Complainant prays for judgment in her favor and that court award her the following:

1. That the Complainant be reinstated to her prior employment.

2. That the Respondents be ordered to appoint Complainant as a full time police officer.

3. That the Respondents, their agents, servants or employees, be ordered and directed to correct the Complainant's personnel records to show that the accumulated sick leave benefits used for her pay while she was disabled from work was erroneously used.

4. That the Respondents, their agents, servants, or employees be ordered and directed to correct their records to show that the payment for her disability was paid under the statutory provisions of M.G.L. c. 41 § 111F.

5. That the Respondents be ordered to pay Complainant fair and reasonable compensation for her emotional distress.

6. That the Respondents be ordered to pay Complainant compensation for her consequential damages.

7. That the Respondents be ordered to pay Complainant punitive damages for violation of her rights under M.G.L. c. 151B.

8.  That the Respondents be ordered to pay Complainant her reasonable attorneys

fees.

9.  For such other and further relief as this Commission may deem just and proper.


Respectfully submitted
By Complainant's Attorney,

LAW OFFICES OF TIMOTHY M. BURKE


Brian Rogal, Esq., BBO #424920
160 Gould Street, Suite 111
Needham, MA  02494
(781) 455-0707

# APPENDIX TEN

## AFFIDAVIT OF DONALD F. HOWELL

I, Donald F. Howell, upon my oath do solemnly swear and affirm that:

1. I am a resident of the Town of Harwich, Barnstable County, Commonwealth of Massachusetts.

2. I presently serve as the Chairman of the Town of Harwich Board of Selectmen. I was elected to the position of Selectman on May 16, 2000.

3. The Board of Selectmen for the Town of Harwich are responsible for: policy-making, as the head of the executive branch of the Town government, causing laws, ordinances and policies to be enforced, investigation of any and all Town affairs, involving any department, serving as licensing and contracting authority for the Town, approval of a budget and financial plans for presentation to the Town Meeting, and the appointment of various Boards, Commissions and Committees, a Town Administrator, a Town Accountant, a Fire Chief, a Police Chief and police officers.

4. In a letter dated June 17, 2003, Police Chief William Mason recommended to the Board of Selectmen that the employment of probationary full-time police dispatcher and part-time special police officer Carolyn Jones be terminated. In a letter to the selectmen, Chief Mason explained:

   > "Dispatcher Jones' actions in this [her failure to follow the chain of command, failure to follow policies and procedures of the Department, her efforts to manipulate departmental records, and her untruthfulness]and the prior incident are unacceptable, have negatively affected her professional reputation, as well as reflecting poorly on her credibility and the reputation of the Harwich Police Department…The serious nature of these incidents causes me to question this employee's credibility and truthfulness; therefore, I find it unnecessary to continue my evaluation during the remainder of her probationary period."

5. Based upon Chief Mason's recommendation, and after deliberating amongst ourselves, the Board of Selectmen

voted to terminate Ms. Jones' employment with the Town of Harwich.


Signed under the pains and penalties of perjury that the above statement is true and accurate to the best of my knowledge, recollection and belief.

DATED:

# APPENDIX 11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CAROLYN E. JONES,
Plaintiff

v.                                          Civil Action No. 04-10133-MEL

WILLIAM A. MASON, Chief of
Police, Harwich Police Department
and TOWN OF HARWICH,
Defendants

---

### Defendant, William A. Mason's Answers To Plaintiff's First Set of Interrogatories

Interrogatory No. 1

State the names, addresses, all telephone numbers, and relationship to you of all persons
who saw or heard, or claim to have seen or heard, or whom you have any   reason to
believe have any knowledge of any of the incidents, allegations, injuries or damages
referred to in the complaint or defenses.

Answer No. 1



Harwich Police Lieutenant Barry Mitchell
183 Sisson Road
Harwich, MA 02645

Harwich Police Lieutenant Thomas Gagnon
183 Sisson Road
Harwich, MA 02645

Harwich Police Officer Michael Porter
183 Sisson Road
Harwich, MA 02645

Harwich Police Sergeant Christopher Kender
183 Sisson Road
Harwich, MA 02645

Harwich Police Sergeant Dennis Kendrick
183 Sisson Road
Harwich, MA 02645
Harwich Police Sergeant David Jacek
183 Sisson Road

as a regular officer. Due to his request, he was appointed a special officer, remained cruiser qualified, maintains all training standards and requirements, and regularly fills shift sector assignments.

Two additional retired full-time regular officers, Sergeant Chester Wright and Officer Earl LeGeyt, both of which had approximately 30 years of service with the Harwich Police Department, requested to be retained as special officers. They are both technically cruiser qualified; however, neither of them have been utilized to fill shift assignments since their retirement.

The number of cruiser qualified special officers has been steadily decreased over the past four years as patrol sector assignments are relegated to regular full-time officers as much as possible. Currently there are only four special officers who are cruiser qualified, all of whom received this status prior to my arrival.

Since my arrival, **no special officer** (male or female) has become "cruiser qualified." To obtain this qualification necessitates an extensive field training process consisting of 10 weeks (or more) of individualized instruction where both the field training instructor and special officer are paid during the process. This is not cost effective to the Town or Department as the majority of the subsequent service involves filling private details where a marked cruiser is needed as opposed to filling patrol sector assignments.

Interrogatory No. 12

Describe each interaction that you had with the plaintiff in her capacity as a union official, giving the dates, the place, the identity of the people present, the subject discussed, the outcome, and a description of the plaintiff's role.

Answer No. 12

During the meetings I had with Ms. Jones as secretary of the local union, she rarely said anything at all, critical or otherwise. In these meetings National Representative Sean McArdle did the majority of the speaking, followed by then Union President William Willis, and to a much lesser extent Vice President Adam Hutton. Other than two questions in one meeting, I do not recall having any conversations with Ms. Jones regarding union matters. There was absolutely no hostility, contention, controversy, or criticism in any conversation, comment, or meeting I had with Ms. Jones in her role as union secretary.

Interrogatory No. 13

State each and every reason why the plaintiff was not offered a full time position as a police officer for the Town of Harwich. If any of the reasons are that the plaintiff was not qualified or unsuitable, state the basis for each such reason, including the identity of all facts, statements or documents on which you rely.

Answer No. 13

The following officers have been hired since my appointment as Chief of Police utilizing the hiring processes specified.

Previous Selection Process – Hired first as a seasonal special, then a year-round special, then a full-time year round special (i.e. working 40 hour per week schedule similar to a regular officer, cruiser qualified, and assigned to sectors). When openings for regular officer were available, full-time year-round specials would be interviewed by command staff who would make recommendations to the chief who would then interview and make the final determination. Regular officers I recommended for appointment under this process were:

> James Cheverie
> Tracey Clarke
> Heath Eldridge

Ms. Jones was not hired under this process as she did not qualify for the following reasons:

1.  She did not request to be hired as a full-time officer at this time. To the contrary, she resigned her position as a full-time dispatcher to continue her education.

2.  She never served as a full-time year-round special working a 40 hour per week schedule or any variant of a regular officer's schedule.



3.  Ms. Jones was not "cruiser qualified" under any standard, previous or current, of the Department.

Current Selection Process – Formal public advertisement and posting of available full-time regular officer positions or the need to establish an eligibility list, review of the letter of interest/resume, professionally developed written examination, oral board, and complete background investigation to establish the initial eligibility list. Prior to actual hiring, a second interview with members of the command staff and the Chief, written and oral psychological examinations, comprehensive medical, and the State physical assessment test (PAT) must be completed and passed. Once hired, the basic recruit academy (if needed), followed by a 10 week field training program, and one year probationary period complete the selection process. The rational for each of these steps in the selection process is self-explanatory. Regular officers hired under this process include:

> Thomas Clarke
> Edward Cronin
> Paul Boorack
> Joseph LaBelle
> Marc Harris
> Chris Van Ness
> Richard Buttrick
> Derek Dutra
> Ryan Mawn
> (current vacancy pending appointment)

Ms. Jones was not hired under this process as she did not qualify specifically because she did not apply for the position, submit an application, or complete any portion of the selection process.

The current process utilized by the Harwich police Department is nationally accepted and recognized as the standard for police recruit selection by every major police professional organization including the International Association of Chiefs of Police, Massachusetts Chiefs of Police Association, Colorado Association of Chiefs of Police, Standards for Law Enforcement Accreditation, and utilized by the vast majority of the law enforcement agencies throughout the United States including Massachusetts and Cape Cod jurisdictions. Although the Harwich Police Department **is not** a Civil Service Agency, the selection process replicates many portions of the Massachusetts civil service process. In addition, courts throughout the United States have ruled in favor of this selection process including Massachusetts.

Interrogatory No. 14

Identify each person that you recommended to be hired as a full time police officer by Harwich, and state the basis for your decision to recommend that person be hired. Include all reasons for hiring that person instead of the plaintiff.

Answer No. 14

Please refer to answer to Interrogatory Number Thirteen.

Interrogatory No. 15

Describe in detail the process you filed for hiring full time police officers for the Town of Harwich. As part of your answer describe all requirements or criteria that you recommended or decided would be part of the hiring process, including the use of any test or list. For each such requirement or criteria describe all facts and reasons for the use of that criteria or requirement, including all documents, facts or sources which you relied upon for or to justify their establishment, or to which show that any such test or requirement is related to being a successful police officer. If the requirements have changed since you have been Chief of Police, give the dates of the changes, a description of the process both before and after the changes, and the reasons for each change.

Answer No. 15

Please refer to answer to Interrogatory Number Thirteen.

Interrogatory No. 16

Do you allege that the plaintiff improperly altered any entry into the master name data base maintained by the Harwich Police Department? If so, state the basis for that allegation. Include in your answer the date of all such actions, what was changed, a

# APPENDIX 12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CAROLYN E. JONES,       )
    Plaintiff       )
                )        Civil Action No. 04-10133-MEL
V.       )
                )
WILLIAM A. MASON, Chief of       )
Police, Harwich Police Department       )
and TOWN OF HARWICH,       )
    Defendants,       )
                )

PLAINTIFF'S ANSWERS TO DEFENDANT TOWN OF HARWICH'S
FIRST SET OF INTERROGATORIES

Interrogatory No. 1

Please state your full name, date and place of birth, residential and work

addresses, social security number, marital status, and the name(s) and date(s) of birth of

your child(ren), if any.

Answer to Interrogatory No. 1

Carolyn Eileen Jones. August 9, 1969, Hyannis, Massachusetts. Home: 28

Harrington Way Hyannis MA 02601. Work: 127 Depot Road Chatham, MA 02633.

Social Security No. 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. Single. No children.

Interrogatory No. 2

Please provide a complete and detailed description of your educational history,

commencing with high school, and indicating all degrees or certificates attained and dates

of same.

Interrogatory No. 8

If any statement has been taken from the defendant or its agents, servants, or employees, whether written or oral, or received from any person including yourself regarding in any way the occurrences set forth in your complaint, please describe: the name and address of the person from whom the statement was obtained, the date of such statement, the substance of such statement, and the name and address of the custodian of such statement.

Answer to Interrogatory No. 8

No such statement has been taken.

Interrogatory No. 9

Please state the basis for your contention that the plaintiff "has sought a full time position as a police officer in Harwich," as alleged in paragraph five of the complaint.

Answer to Interrogatory No. 9

I told Lt. Gagnon that I wanted to do full time patrol. I have talked to many officers over the time I was employed about becoming a full time police officer, always telling them that it was my goal. I asked Chief Mason about the process for becoming a full time police officer. I do not recall the times and places of these conversations.

Interrogatory No. 10

Please state the basis for your contention that "[w]hen Harwich does hire a female police officer they (sic) wind up leaving the department,: as alleged in paragraph seven of the complaint.

Answer to Interrogatory No. 10

Harwich's first full time female police officer was Jen van Gelder, who. Next was Diane Aikmen who left the department after a short period of time. At the time it was stated that she left the department after alleged incident of sexual harassment. Tracy Clarke is currently the only female full time police officer. The department has never had more than one full time female police officer at the time.

Interrogatory No. 11

Please state the basis for your contention that "in the police union...[the plaintiff] was critical of the police chief and police administration. She also complained about not being hired as a full time officer," as alleged in paragraph twelve of the complaint, including in the answer, but not limiting it to, a description of each and every time the plaintiff made a "critical" statement or a "complaint," to whom such criticism or complaint was delivered, and the date and substance of each communication.

Answer to Interrogatory No. 11

I spoke out as a Union Board officer on a number of issues, including overtime, zeroing of hours and issues related to patrolling by officers. Many of these conversations were at meetings with the Chief and other Board members and officers. I also spoke with union officials and members about the issues and how the department was handling them. I do not recall the dates of meetings. I was vocal and outspoken with the Chief. I wrote a letter to the membership that expressed my outrage at having my integrity questioned. I questioned the decision to pull me off of bike patrol, and tried to find out why I was not allowed to drive a cruiser.