UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAROLYN E. JONES,    )<br>    Plaintiff    )<br>    )<br>V.    )<br>    )<br>WILLIAM A. MASON, Chief of    )<br>Police, Harwich Police Department    )<br>and TOWN OF HARWICH,    )<br>    Defendants,    )<br>    ) | Civil Action No. 04-10133-MEL |

PLAINTIFF'S STATEMENT OF CONTESTED
FACTS AND STATEMENT OF ADDITIONAL OF
UNCONTESTED FACTS PURSUANT TO LOCAL RULE 56.1

1. The Collective Bargaining Agreement (CBA) between the Town of Harwich and the Harwich Police Union provides that union members can only be fired for just cause. Article VIII of the CBA grants management a twelve month probationary period for new hires. Section 4 of that article specifies that probationary employees do not get the benefit of just cause discharge. The CBA specifies that a new hire must be given specific written notice of the probationary period. (Ex. 1)

2. In February 1998 Ms. Jones applied for a dispatcher position in the police department of the Town of Harwich. She was required to sign, and have notarized, a one page form, the primary point of which was to make certain that she was aware of the probationary period. (Transcript of Arbitration Hearing, hereinafter "Arb.", p. 230) Ms. Jones was also specifically told that she would be subject to a probationary period of twelve months if hired. Arb. p. 229-230.

3. Prior to being offered a job in Harwich, Ms. Jones was offered, and took a job as a dispatcher in Chatham. Arb. p. 228. In 1999 she was again approached by several officers from Harwich, including then Chief Greenwood, about the dispatching job, and she agreed to take it. Arb. p. 230-231. Her initial appointment was on July 1, 1999 as an Assistant Dispatcher. Arb. p. 232 . Effective December 1, 1999, Ms. Jones became a permanent full time dispatcher.

4. Hiring for the Harwich police is through the Board of Selectmen, who sent Ms. Jones a letter offering her the position.

5. Ms. Jones completed her probationary period without problem. Ms. Jones had no disciplinary issues, received no negative evaluations, was not advised of any dissatisfaction with her performance, and received no counseling. In fact Ms. Jones received "good guy" letters during that period. She received a written evaluation every three months during that time period, with the evaluations being made by a number of different sergeants. Her evaluations were excellent, and her final evaluation was "Excellent" and "Outstanding". (Ms. Jones' affidavit)

6. Chief Mason was appointed by the Town in April 2000. He familiarized himself with the Department and assumed command in June 2000. Thus he had ample time to get to know Ms. Jones and observe her performance prior to the end of her probation on November 30th. He was satisfied with her performance and made no attempt to discharge her before the end of her probation.

7. In January 2001 Ms. Jones resigned her full time dispatching position to further her education. Arb. p. 238. Ms. Jones is nearing completion of her bachelors' degree in criminal justice. Her goal was to become a full time police officer. She told a number of

ranking officers in the Harwich Police Department that it was her goal to become a full time police officer, including Lt. Gagnon, one of the highest ranking officials. Arb. p. 72, 242; Ms. Jones' affidavit.)

8. Although she resigned her full time dispatching position, Ms. Jones did not leave the employ of the Harwich Police Department. Arb. p. 239. Ms. Jones was reappointed as a special police officer every year until her termination in June 2003. Arb. p. 240. That included reappointments by Chief Mason in the years 2000, 2001 and 2002. Ms. Jones was also appointed as an assistant animal control officer (ACO) on July 1, 2001 (Ex. 2; Arb. p. 240). Ms. Jones never left the employ of the Town.

9. In late 2002 Harwich Police Lieutenant Gagnon asked Ms. Jones to return to full time duties as a dispatcher. Arb. p. 241. Ms. Jones was hesitant at first. Arb. p. 242. One of the facts that convinced her was a statement by Lt. Gagnon that dispatching was a "foot in the door" for a patrol officer position. Arb. p. 242. Ms. Jones agreed to return to work as a full time dispatcher effective December 1, 2002.

10. On November 15, 2002 Chief Mason sent a letter to the Selectmen asking for her reappointment as a dispatcher. (Ex. 3) He stated:

> After *careful review* of Ms. Jones' background, resume, *work performance*, and *staff recommendation*, I am recommending that she be appointed as a full time dispatcher… (emphasis supplied)

11. Chief Mason and Lt. Gagnon testified at arbitration that they considered starting Ms. Jones at Step 3 on the pay scale, but eventually learned that they could not start her higher than Step 2. Arb. p. 73.

12. In his letter recommending her reinstatement Chief Mason stated:

> Due to Special Officer Jones' knowledge of the position, Town, and Department, she will require no additional training to fulfill the responsibilities as a full-time dispatcher.

13. The letter from the Selectmen reinstating Ms. Jones as a dispatcher does not contain any of the customary language relating to the need to serve a probationary period. In fact, no one, including Chief Mason or Lt Gagnon, ever stated that Ms. Jones needed to serve a second probationary period, nor was she ever given any notice of any such requirement. Arb. p. 63-65, 86, 94-95, 98-99, 246, 294-295)

14. It is uncontested that Ms. Jones did not receive the notice of probationary status required by Section 4 of Article 8 of the CBA, which states:

> New applicants are advised of this provision (the requirement for probation) in writing.

15. Almost immediately after her return to full time work Ms. Jones was elected as a Union officer. The Union does not allow probationary employees to become officers since they are subject to discharge without cause, making it possible to take action against them because of their union advocacy. The Union specifically concluded that Ms. Jones was not on, or subject to a second probationary period.

16. Ms. Jones was not treated as a probationary employee. Chief Mason's letter acknowledges that she needed no new training, and that he was satisfied with her performance after consulting with staff. (Ex. 3) Lt. Gagnon testified that the reason they tried to put her on Step 3 of the pay scale was that Ms. Jones didn't require training and had experience. Arb. p. 73-74.) The police department did not see any reason to continue the evaluation process with her. Arb. p. 258. It did not counsel her after she went back to full time. Arb. p. 259. When first hired Ms. Jones received training. Arb. p.

236-237. When she resumed full time duties the Town gave her no training; not even a refresher course. Arb. p. 258-259.

17. The Town filed suit in an attempt to block this arbitration from taking place. Despite the hornbook rule that questions of arbitrability are for the arbitrator, the Town asked a superior court judge to enjoin this arbitration based upon the same argument it advances here, that Ms. Jones was a probationary employee. The Court rejected that argument and denied the injunction. Harwich is now in the process of dismissing that action.

18. Harwich then objected to the arbitrability of the discharge, arguing that Ms. Jones was on probation and that it did not have to show good cause for her discharge. On a motion from Harwich the arbitrator agreed to bifurcate the hearing and decide the question of arbitrability first.

19. The arbitrator held that Ms. Jones was not on probation, that the Town had not given Ms. Jones any notice that it believed she was on probation, and that the Town had to establish just cause for her discharge.

20. Harwich Police Officer Brackett, who was called as a management witness in the arbitration, testified that Ms. Jones "bitched to plenty of people in management…", was "usually telling me to shut up", and "never had any problem bitching about anything that was brought to her attention about union activities". Arb. p. 161, 163.

21. Harwich has a number of special police officers who are considered "cruiser qualified". In addition to the three named by the Town, Neil Nolan, Heath Eldredge, Bob Curry, Ed Silva, Earl Legyt, John Sullivan and Chester Wright have or are considered cruiser qualified. They are all male. Some of these men have been allowed to

continue on as "cruiser qualified" special police officers. Ms. Jones had asked for training to become cruiser qualified, but was never given that training. Despite her requests the department would not even tell her what was required to become cruiser qualified. Even prior to Chief Mason's arrival Harwich had a field training officer who was tasked to provide training to special police officers. Ms. Jones Affidavit and answer to interrogatory 14.

22. Special police officers who are cruiser qualified have a better range of employment opportunities including specifically the opportunity to fill in on regular patrols for full time officers. This provides additional income and builds a resume for applying for full time positions.

23. Chief Mason promoted several special police officers who were cruiser qualified to regular full time police officers. All of these individuals were male. Mason Deposition. p. 55, 66.

24. Had Ms. Jones been allowed to become cruiser qualified Chief Mason would have had no excuse for failing to promote her to a regular police officer position.

25. There was only one female patrol officer when Ms. Jones was discharged, and there have never been more than two. Ms. Jones affidavit.

26. Town witnesses have admitted they knew that Ms. Jones' goal was to become a patrol officer. That opportunity was never extended to her.

27. Ms. Jones was vocal in her disagreement over Chief Mason decision to prohibit officers from wearing an American flag patch on their shoulder or an American flag pin on their lapels, both of which had previously been allowed. She expressed that

opposition both as a union official, and personally, and spoke to numerous members of the police department including ranking officers. Ms. Jones affidavit.

28. Ms. Jones spoke out as a Union officer on a number of issues, including overtime, zeroing of hours and issues related to patrolling by officers. Many of these conversations were at meetings with the Chief and other Board members and officers. Ms. Jones also spoke with union officials and members about the issues and how the department was handling them. She was vocal and outspoken with the Chief. She wrote a letter to the membership that expressed her outrage at having her integrity questioned. She questioned the decision to pull her off of bike patrol, and tried to find out why she was not allowed to drive a cruiser. Ms. Jones Answer to Interrogatory 11; Arb. p. 298-299.

29. Other issues that were raised included disputes about how overtime should be distributed, receiving the Quinn Bill (which affects salaries), and pay raises. Willis.

30. All four of the Union officers were subject to some form of discipline. They were the only officers disciplined during an approximately one year period. Arb. p. 257, 298-299. Ms. Jones' affidavit. Ms. Jones has since been fired, and each of the other officers has resigned or refused to run for reelection. Id.

31. Special police officers were designated either year round or seasonal. There was no full time or part time designation. Ms. Jones's "service" record, maintained by the Town shows that she was appointed as a year round special police officer. Ms. Jones affidavit; Ex. 2.

32. Harwich's first full time female police officer was Jen van Gelder, who was discharged. Next was Diane Aikman who left the department after a short period of time. At the time it was stated that she left the department after alleged incident of sexual

harassment. Tracy Clarke was then the only female full time police officer until another officer was hired within the past few months. The department has never had more than two full time female police officers at the time. Ms. Jones Answer to Interrogatory Number 10.

## Paid Detail During a Snow Storm

33. The collective bargaining agreement calls for officers to be paid for four hours if a detail is not cancelled at least one and a half hours prior to the scheduled start of the detail. The detail Ms. Jones was scheduled to work on February 18, 2004 was not cancelled within that time. It is undisputed that the contractor made no attempt to work that detail and when finally contacted stated that it was cancelled. Jones Affidavit.

34. The Collective Bargaining Agreement does not require that the officer appear at the detail in order to be paid. If notice of cancellation is not given in time then the officer is entitled to be paid. Ms. Jones confirmed that fact with the union president before submitting her detail slip. Affidavits of Jones and Hutton

35. Ms. Jones could not get to the detail site by the scheduled start time of 7:00 AM because of the snow storm, and had advised the Harwich police dispatcher of that fact. Jones Affidavit.

36. Officer Cronin, a male, was also scheduled to work that detail. Ms. Jones telephoned his house and woke him up. He had assumed that the detail was cancelled. Officer Cronin went to the police station, rather than the detail site, arriving there after 7:00 AM. The sergeants in charge, Sgt. Jacek initially and then Sgt. Sayers, both told Officer Cronin to stay at the station because the roads were not safe. Around 8:30 Sgt.

Sayers told Officer Cronin to go to the detail site. Just before he got there Officer Cronin was told that the detail had been cancelled. In his testimony,

> "Right as I got to the site, as I hit Depot Road, Dispatcher Clough called up and said that the detail was canceled…I was right about at the site." Deposition of Officer Cronin, pg. 18.

He never got out of his cruiser and did no work at the detail site. Id. Pg. 19-20. He was paid for four hours for the detail, without question and without discipline. No one ever even asked to look at his detail slip, and he does not recall how he filled it out. Deposition of Officer Cronin, pg. 7, 11-12, 23; Jones affidavit.

37. There is no standard way to fill out a detail slip where the officer is requesting the minimum of four hours. Deposition of Officer Brackett, p. 8. Some officers simply put down four hours: others list the hours actually present. Deposition of Lt. Mitchell[1], pg. 116. No other person has been disciplined for putting in for the minimum of four hours for a detail that was cancelled late. Hutton Affidavit.

38. Officer Cronin testified that it did not matter what you put down as long as you put four hours down and the start time. He has never been criticized for how he fills out a detail slip. The secretary that handles the detail slips, Karen Young, told him it did not matter what he put down since she only looks for the total number of hours. He described Ms. Young as running the station and the person that taught him how to fill out detail slips. Officer Cronin's custom was to put down the hours that the detail was scheduled for and then the minimum of four hours. He had no idea how anyone looking at that slip would know if he had actually worked four hours or was being paid for the contractual minimum. Cronin Deposition, pg. 27-30.

---

[1] There are no captains in the Harwich police department. Lieutenant is the next rank below Chief. Mitchell deposition, pg. 11. He is in charge of the operations division which includes supervision of all uniformed personnel and dispatcher. Id. pg. 6.

39. The Town's produced a transcript of a telephone conversation between Officer Cronin and Ms. Jones on the morning of the detail. According to that transcript Officer Cronin suggested that Ms. Jones just say she had come in to the detail and left, a statement that would be false. The only discipline he received for telling Ms. Jones she should falsify a report was counseling by Lt. Mitchell. Chief Mason deposition, pg. 124-125.

40. The only other discipline imposed by the Town related to details involved a male officer, who attempted to receive pay for a detail at the same time he was being paid for still being on duty. The discipline was not disclosed but did not include discharge. Town of Harwich Answer to Interrogatory Number 7.

Request For Leave on April 15, 2003

41. On April 15, 2003 Ms. Jones spent the entire day firing her weapon at the police firing range. Her hand became too sore for her to work. Ms. Jones was eventually seen for the injury in the emergency room and by the Town's doctor. Both confirmed the existence of the injury and the fact that it was debilitating. The Town does not dispute the fact that the injury occurred and that Ms. Jones was unable to work. Deposition of Chief Mason, pg. 125-126, 128-129.

42. The Town has refused to pay Ms. Jones for the time she missed work despite the fact that M.G.L. c. 41, sec. 111F provides for full payment of salary to police officers who are injured on duty.

43. The Town pays a sick leave incentive to officers who do not use sick leave. Officers also have the right to take floating holidays. They can request a holiday shortly before their shift. The practice of the police department has been to grant the holiday

leave provided that a sufficient number of officers are working. Usually the dispatcher will check the assignment book to determine how many officers are working and thereby determine whether the officer can take a holiday. Officers will often use a holiday rather than a sick day in order to preserve their sick leave bonus. If staffing does not allow the use of a holiday than they still have the option of taking a sick day, which cannot be denied.

44. Ms. Jones did not want to report that she had injured her hand firing her weapon because she believed that she would be ostracized. It was her experience that other police officers made fun of and looked down upon officers who reported that they were injured. (Ms. Jones' affidavit.)

45. Ms. Jones had suffered a similar injury to her hand when she attended the firing range the previous year. On that occasion she used sick leave rather than report that she had been injured on duty. (Ms. Jones' affidavit)

46. No other officer has been disciplined for any alleged violation of reporting of an injured on duty claim. The only discipline ever imposed by the Department for sick leave abuse is counseling, and on one occasion two male officers received an undisclosed discipline, not involving discharge, for faking illness. Town of Harwich Answer to Interrogatory Number 6.

        Respectfully submitted
        By Plaintiff's Attorney,

        _/s/ Brian Rogal_____
        Brian Rogal, Esq., BBO #424920
        Law Offices of Timothy Burke
        160 Gould Street, Suite 111
        Needham, MA 02494
        (781) 455-0707