Ms. Jones resigned her position as a regular full-time Dispatcher on January 6, 2001, after serving in that position for just over one year. As a result of that resignation, when she was rehired as a regular full-time Dispatcher, her seniority started anew and she was rehired as a new employee. Thus, Article III (Seniority) of the Collective Bargaining Agreement indicates that seniority as a regular full-time member of the Harwich Police Department is broken by termination or by a leave of absence in excess of six months. C Continuity in seniority is only permitted as a result of vacation leave, sick leave, injured leave, suspension, or any call to military service.

Thus, on June 17, 2003, Jones had served for six and one-half months and had not completed the twelve month probationary period required by Article VIII. Her Special Police Officer service (in a position not covered by the Contract) does not count toward satisfying probation as a regular full-time Dispatcher, a position from which Ms. Jones resigned on January 6, 2001.

As a probationary employee, under Article VIII, Section 4, Ms. Jones' termination is not subject to grievance and arbitration under the Collective Bargaining Agreement.

Every employee I have recommended for hire has served a probationary period consistent with the past practice of the Department and provisions of the Contract. Ms. Jones was unquestionably, even by Union acknowledgement, a "new hire."

Interrogatory No. 10

For the period from January 1, 1997 to the present describe in detail all requirements that special police officers had to satisfy in order to drive a police cruiser while on patrol or on details without having another officer with them. As part of your answer state the basis for each such requirement including identifying the source of the requirement, the person creating the requirement and whether it was written or oral.

Answer No. 10

Prior to my arrival, I was informed that there was a field training program for post-academy special and regular police officers; however, it was not standardized or written. I have been unable to find any specific documentation regarding this process.

The development of a formalized Field Training Instruction program was in-progress upon my arrival (June 22, 2000) with the first instructor, Officer Terry Dinnan, being trained in the San Jose, California method of instruction which is recognized as the national standard for field training. The manual was developed and finalized, based upon the San Jose model, by Sergeant Chris Kender who is in charge of the Field Training Instruction Program for the Harwich Police Department. Please refer to the *Harwich Police Department Field Training Instruction Manual* for details regarding the comprehensive program that must be completed by **every** officer prior to becoming "cruiser qualified."

Interrogatory No. 11

For the period from January 1, 1997 identify each special police officer, describe all things each officer did to qualify to operate a police cruiser on their own, or become "cruiser qualified", including a full description of all dates and types of training, and the date they became qualified. Describe in detail all training requirements and all sources or reasons for the imposition of each such training requirement. If the plaintiff was not so qualified state each reason why she was not considered to be qualified.

Answer No. 11

As previously stated, since my arrival, **no special officer** (male or female) has become "cruiser qualified." To obtain this qualification necessitates an extensive field training process consisting of 10 weeks (or more) of individualized instruction where both the field training instructor and special officer are paid during the process. This is not cost effective to the Town or Department as the majority of the subsequent service involves filling private details where a marked cruiser is needed as opposed to filling patrol sector assignments.

Sometime in 2001, Ms. Jones attempted to become "cruiser qualified" but never completed the necessary training. Lieutenant Manuel Gomes (now retired) was in charge of patrol operations at that time. Lieutenant Gomes advised me that Ms. Jones had not successfully completed the training and was **not** cruiser qualified. To my knowledge, a request to continue or complete the training was never made by Ms. Jones to me or any other supervisor on the Department.

Since the responsibilities and liabilities of a part-time special officer functioning as a regular officer in the field with a cruiser is equal to or greater than that of a regular officer who receives a higher level of total training, the process of qualifying a part-time special is equal to or greater than a full-time regular officer. A full-time regular officer, after completing a 24 week Massachusetts Criminal Justice Training Council approved Basic Recruit Academy (over four times the class hours of the intermittent academy for special officers) has an average of 10 additional weeks of field training to become cruiser qualified and able to work the road by themselves.

Due to costs and time constraints on available resources, the practice of training part-time special officers as cruiser qualified has been eliminated.

**All currently cruiser qualified special officers received that status prior to my arrival in June, 2000.** The following special police officers are currently cruiser qualified:

- John F. Sullivan, Sr.        hired June 6, 1980
- Robert Currie               hired June 15, 1982
- David Brouillette           hired June 1, 1998
- Keith Lincoln               hired July 1, 1998

Regular full-time Officer Edward Silva requested to go to part-time status in 2004 to pursue development of a private business. Officer Silva had a stellar work record with the Department

as a regular officer. Due to his request, he was appointed a special officer, remained cruiser qualified, maintains all training standards and requirements, and regularly fills shift sector assignments.

Two additional retired full-time regular officers, Sergeant Chester Wright and Officer Earl LeGeyt, both of which had approximately 30 years of service with the Harwich Police Department, requested to be retained as special officers. They are both technically cruiser qualified; however, neither of them have been utilized to fill shift assignments since their retirement.

The number of cruiser qualified special officers has been steadily decreased over the past four years as patrol sector assignments are relegated to regular full-time officers as much as possible. Currently there are only four special officers who are cruiser qualified, all of whom received this status prior to my arrival.

Since my arrival, **no special officer** (male or female) has become "cruiser qualified." To obtain this qualification necessitates an extensive field training process consisting of 10 weeks (or more) of individualized instruction where both the field training instructor and special officer are paid during the process. This is not cost effective to the Town or Department as the majority of the subsequent service involves filling private details where a marked cruiser is needed as opposed to filling patrol sector assignments.

Interrogatory No. 12

Describe each interaction that you had with the plaintiff in her capacity as a union official, giving the dates, the place, the identity of the people present, the subject discussed, the outcome, and a description of the plaintiff's role.

Answer No. 12

During the meetings I had with Ms. Jones as secretary of the local union, she rarely said anything at all, critical or otherwise. In these meetings National Representative Sean McArdle did the majority of the speaking, followed by then Union President William Willis, and to a much lesser extent Vice President Adam Hutton. Other than two questions in one meeting, I do not recall having any conversations with Ms. Jones regarding union matters. There was absolutely no hostility, contention, controversy, or criticism in any conversation, comment, or meeting I had with Ms. Jones in her role as union secretary.

Interrogatory No. 13

State each and every reason why the plaintiff was not offered a full time position as a police officer for the Town of Harwich. If any of the reasons are that the plaintiff was not qualified or unsuitable, state the basis for each such reason, including the identity of all facts, statements or documents on which you rely.

Answer No. 13

The following officers have been hired since my appointment as Chief of Police utilizing the hiring processes specified.

Previous Selection Process – Hired first as a seasonal special, then a year-round special, then a full-time year round special (i.e. working 40 hour per week schedule similar to a regular officer, cruiser qualified, and assigned to sectors). When openings for regular officer were available, full-time year-round specials would be interviewed by command staff who would make recommendations to the chief who would then interview and make the final determination. Regular officers I recommended for appointment under this process were:

James Cheverie
Tracey Clarke
Heath Eldridge

Ms. Jones was not hired under this process as she did not qualify for the following reasons:

1. She did not request to be hired as a full-time officer at this time. To the contrary, she resigned her position as a full-time dispatcher to continue her education.

2. She never served as a full-time year-round special working a 40 hour per week schedule or any variant of a regular officer's schedule.

3. Ms. Jones was not "cruiser qualified" under any standard, previous or current, of the Department.

Current Selection Process – Formal public advertisement and posting of available full-time regular officer positions or the need to establish an eligibility list, review of the letter of interest/resume, professionally developed written examination, oral board, and complete background investigation to establish the initial eligibility list. Prior to actual hiring, a second interview with members of the command staff and the Chief, written and oral psychological examinations, comprehensive medical, and the State physical assessment test (PAT) must be completed and passed. Once hired, the basic recruit academy (if needed), followed by a 10 week field training program, and one year probationary period complete the selection process. The rational for each of these steps in the selection process is self-explanatory. Regular officers hired under this process include:

Thomas Clarke
Edward Cronin
Paul Boorack
Joseph LaBelle
Marc Harris
Chris Van Ness
Richard Buttrick
Derek Dutra
Ryan Mawn
(current vacancy pending appointment)

Ms. Jones was not hired under this process as she did not qualify specifically because she did not apply for the position, submit an application, or complete any portion of the selection process.

The current process utilized by the Harwich police Department is nationally accepted and recognized as the standard for police recruit selection by every major police professional organization including the International Association of Chiefs of Police, Massachusetts Chiefs of Police Association, Colorado Association of Chiefs of Police, Standards for Law Enforcement Accreditation, and utilized by the vast majority of the law enforcement agencies throughout the United States including Massachusetts and Cape Cod jurisdictions. Although the Harwich Police Department **is not** a Civil Service Agency, the selection process replicates many portions of the Massachusetts civil service process. In addition, courts throughout the United States have ruled in favor of this selection process including Massachusetts.

Interrogatory No. 14

Identify each person that you recommended to be hired as a full time police officer by Harwich, and state the basis for your decision to recommend that person be hired. Include all reasons for hiring that person instead of the plaintiff.

Answer No. 14

Please refer to answer to Interrogatory Number Thirteen.

Interrogatory No. 15

Describe in detail the process you filed for hiring full time police officers for the Town of Harwich. As part of your answer describe all requirements or criteria that you recommended or decided would be part of the hiring process, including the use of any test or list. For each such requirement or criteria describe all facts and reasons for the use of that criteria or requirement, including all documents, facts or sources which you relied upon for or to justify their establishment, or to which show that any such test or requirement is related to being a successful police officer. If the requirements have changed since you have been Chief of Police, give the dates of the changes, a description of the process both before and after the changes, and the reasons for each change.

Answer No. 15

Please refer to answer to Interrogatory Number Thirteen.

Interrogatory No. 16

Do you allege that the plaintiff improperly altered any entry into the master name data base maintained by the Harwich Police Department? If so, state the basis for that allegation. Include in your answer the date of all such actions, what was changed, a

complete description of why the change was inappropriate, a complete description of all actions taken to correct any such changes, and a complete description of any investigation into any such changes, including the date and the identity of the investigator.

Answer No. 16

Although the Plaintiff did alter her date of birth in the master name data base, she has never been investigated or disciplined for such conduct.

Signed under the pains and penalties or perjury, this _18th_ day of _October_, 2004.

William A. Mason
Chief of Police

As to objections:

Robert J. Van Campen
BBO # 648638
GILMAN/HOLTZ, P.C.
25 New Chardon Street
Boston, MA 02114
(617) 720-2663

**Certificate of Service**

I, Robert J. Van Campen, hereby certify that I have served a true and accurate copy of the foregoing document upon Brian Rogal, Esq., at 160 Gould Street, Suite 111, Needham, MA 02494, by first class mail.

Robert J. Van Campen

DATED: 10-22-04

# <u>Affidavit of Plaintiff Carolyn Jones</u>

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAROLYN E. JONES,<br>　　　Plaintiff<br><br>V.<br><br>WILLIAM A. MASON, Chief of<br>Police, Harwich Police Department<br>and TOWN OF HARWICH,<br>　　　Defendants, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 04-10133-MEL

## AFFIDAVIT OF PLAINTIFF CAROLYN JONES

I, Carolyn Jones, do hereby depose and say:

1. On December 1, 1999, I became a permanent full time dispatcher for the police department of the Town of Harwich. I had received notice that I would be a probationary employee for twelve months.

2. I completed my probationary period without problem. I had no disciplinary issues, received no negative evaluations, was not advised of any dissatisfaction with my performance, and received no counseling. In fact I received "good guy" letters during that period.

3. I received a written evaluation every three months during that time period, with the evaluations being made by a number of different sergeants. My evaluations were excellent, and the grade on my final evaluation was "Excellent" and "Outstanding".

4. In January 2001 I resigned my full time dispatching position to further my education. I am nearing completion of my bachelors' degree in criminal justice. My goal was to become a full time police officer. I told a number of ranking officers in the Harwich Police Department that it was my goal to become a full time police officer, including Lt. Gagnon, one of the highest ranking officials.

5. In late 2002 Harwich Police Lieutenant Gagnon asked me to return to full time duties as a dispatcher. I was hesitant at first. One of the facts that convinced me was a statement by Lt. Gagnon that dispatching was a "foot in the door" for a patrol officer position. I agreed to return to work as a full time dispatcher effective December 1, 2002.

6. Almost immediately after my return to work I was elected as a Union officer. The Union does not allow probationary employees to become officers since they are subject to discharge without cause, making it possible to take action against them because of their union advocacy. The Union specifically concluded that I was not on, or subject to a second probationary period.

7. Harwich has a number of special police officers who are considered "cruiser qualified". In addition to the three named by the Town, Neil Nolan, Heath Eldredge,

Bob Curry, Ed Silva, Earl Legyt, John Sullivan and Chester Wright have or are considered cruiser qualified. They are all male. Some of these men have been allowed to continue on as "cruiser qualified" special police officers. I asked for training to become cruiser qualified, but was never given that training. I also made repeated requests to the department for a statement of what was required to become cruiser qualified. Even prior to Chief Mason's arrival Harwich had a field training officer who was tasked to provide training to special police officers.

8. Special police officers who are cruiser qualified have a better range of employment opportunities including specifically the opportunity to fill in on regular patrols for full time officers. This provides additional income and builds a resume for applying for full time positions.

9. Chief Mason promoted several special police officers who were cruiser qualified to regular full time police officers.

10. I was vocal in my disagreement over Chief Mason's decision to prohibit officers from wearing an American flag patch on their shoulder or an American flag pin on their lapels, both of which had previously been allowed. I expressed that opposition both as a union official, and personally, and spoke to numerous members of the police department including ranking officers.

11. I spoke out as a Union officer on a number of issues, including overtime, zeroing of hours for overtime assignments, and issues related to patrolling by officers. Many of these conversations were at meetings with the Chief and other union members and officers. However, in many cases, conversations were informal, at the dispatch desk or other locations within the station.

12. I also spoke with union officials and members about the issues and how the department was handling them. I was vocal and outspoken with and about Chief Mason. I also wrote a letter to the membership that expressed my outrage at having my integrity questioned. I questioned Chief Mason's decision to pull me off of bike patrol, and tried to find out why I was not allowed to drive a cruiser.

13. During the time period I was on the Union Board we began contract negotiations. Negotiations were acrimonious, and the contract was not settled until after my discharge and after the contract expired. A major issue was the Quinn Bill which supplements the pay of officers based on their level of education. The Town Administrator reneged on an agreement with the Town's bargaining committee to adopt the Quinn Bill, and did not support the bill at the town meeting. An unfair labor practice charge was filed against Town Administrator. The Union Board also approached Selectmen Hughes about the conduct of Town Administrator Melville. This matter was very public and was in the newspapers. I was part of the Union Board at that time, involved in the opposition and spoke out about the conduct of Mr. Melville and the selectmen.

14. All four of the Union officers were subject to some form of discipline. They were the only officers disciplined during an approximately one year period. I have since been fired, and each of the other officers has resigned or refused to run for reelection.

15. Special police officers were designated either year round or seasonal. There was not a full time or part time designation. I was appointed as a year round special police officer.

16. Harwich's first full time female police officer was Jen van Gelder, who was discharged. Next was Diane Aikman who left the department after a short period of time.

For the past several years Tracy Clarke was the only female full time police officer. Another female officer was hired within the past few months. The department has never had more than two full time female police officers at one time.

17. The collective bargaining agreement calls for officers to be paid for four hours if a detail is not cancelled at least one and a half hours prior to the scheduled start of the detail. The detail I was scheduled to work on February 18, 2003 was not cancelled within that time. The contractor made no attempt to work that detail, and, when finally contacted, stated that it was cancelled.

18. The Collective Bargaining Agreement does not require that the officer appear at the detail in order to be paid. If notice of cancellation is not given than the officer is entitled to be paid. I confirmed that fact with the union president before submitting my detail slip.

19. I could not get to the detail site by the scheduled start time of 7:00 AM because of the snow storm, and had advised the Harwich police dispatcher of that fact. I asked her to inform the sergeant on duty. I never suggested to anyone that they say I was at the site.

20. Officer Cronin, a male, was also scheduled to work that detail. I telephoned his house and woke him up. He had assumed that the detail was cancelled. Officer Cronin went to the police station, rather than the detail site, arriving there after 7:00 AM. He never got out of his cruiser and did no work at the detail site. He was paid for four hours for the detail, without question and without discipline.

21. There is no standard way to fill out a detail slip where the officer is requesting the minimum of four hours. Some officers simply put down four hours: others list the hours actually present. To my knowledge no other person has been disciplined for putting in for the minimum of four hours for a detail that was cancelled late.

22. On April 15, 2003 I spent the entire day firing my weapon at the police firing range. My hand became too sore for me to work. I was eventually seen for the injury in the emergency room and by the Town's doctor. Both confirmed the existence of the injury and the fact that it was debilitating. The Town did not ask for any further documentation of the fact that the injury occurred or that I was unable to work.

23. The Town has refused to pay me for the time I missed work pursuant to M.G.L. c. 41. sec.111F.

24. The Town pays a sick leave incentive to officers who do not use sick leave. Officers also have the right to take floating holidays. They can request a holiday shortly before their shift. The practice of the police department has been to grant the holiday leave provided that a sufficient number of officers are working. Usually the dispatcher will check the assignment book to determine how many officers are working and thereby determine whether the officer can take a holiday. Officers will often use a holiday rather than a sick day in order to preserve their sick leave bonus. If staffing does not allow the use of a holiday than they still have the option of taking a sick day, which cannot be denied.

25. On April 15, 2003 I called in before my shift and spoke to the dispatcher. I asked if I could take a holiday. He said that he was not sure, because he did not have the book. I told him that I would take a sick day but asked that he check the book when he could to see if a holiday was available. Nothing about this was unusual, and I had handled similar requests from male officers when I was a dispatcher.

26. I did not want to report that she had injured my hand firing my weapon because I believed that I would be ostracized. It was my experience that other police officers made fun of and looked down upon officers who reported that they were injured.

27. I had suffered a similar injury to my hand when I attended the firing range the previous year. On that occasion I used sick leave rather than report that I had been injured on duty.

28. I had no trouble on my job until I became a union official. I was never written up or counseled. However, management began to nit pick at my work. Since I worked a late shift I was often the only female working.

29. Some of the officers on my shift had been hired in the interim when I was not a full time dispatcher. All of the officers on the shift were male. I complained that officers were competing to stop as many vehicles as they could, that some stops were inappropriate, that reporting by the officers was sometimes inaccurate, and that the officers were attempting to create an overwhelming work load for me. These complaints were ignored.

30. I believe that I was treated differently than male employees. No male was ever denied a four hour minimum for a detail. No male was denied c. 41, sec. 111F benefits. Male special police officers were trained to be cruiser qualified and eventually promoted. I was not. Although I was recruited back as a dispatcher with the promise that I would have an opportunity to become a regular officer, only the male officers were promoted. Chief Mason then started a testing process. I was never encouraged to take the test, nor was it ever suggested that I apply for a regular position. The police department operated as a boys club, with an atmosphere of bias towards women.

Signed under pains and penalties of perjury.

January 13, 2005            _____
                                Carolyn E. Jones

# Affidavit of Adam Hutton

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CAROLYN E. JONES,          )
    Plaintiff          )
               )          Civil Action No. 04-10133-MEL
V.          )
               )
WILLIAM A. MASON, Chief of    )
Police, Harwich Police Department  )
and TOWN OF HARWICH,       )
    Defendants,          )
               )

## AFFIDAVIT OF ADAM HUTTON

Is, Adam Hutton, do hereby depose and say:

1. I am a police officer for the Town of Harwich. I was previously vice president and president of the Harwich Police Union, and a member of its collective bargaining team and Union Board.

2. The collective bargaining agreement then in effect expired on June 30, 2003, and we were in bargaining in the months prior to that expiration. Carolyn Jones was a member of the Union Board and negotiating team and participated in bargaining.

3. A major issue was obtaining Quinn Bill benefits. It was the union's view that the Town Administrator reneged on an agreement to adopt the Quinn Bill, and the Town did not support the bill at the town meeting. An unfair labor practice charge was to be filed against Town Administrator. A member of the Union Board also approached a Selectman about the conduct of Town Administrator Melville. This matter was very public and was in the newspapers. The members of Union Board at that time, including Ms. Jones, spoke out about the conduct of Mr. Melville and the selectmen.

4. A number of other issues were discussed at that time, including overtime, zeroing of hours for overtime assignments, and issues related to patrolling by officers. Many of these conversations were at meetings with the Chief and other union members and officers. However, in many cases, conversations were informal, at the dispatch desk or other locations within the station. Ms. Jones participated and spoke out in many of these meetings and discussions.

5. Ms. Jones was also vocal in her disagreement over Chief Mason's decision to prohibit officers from wearing an American flag patch on their shoulder which had previously been allowed.

6. All four of the Union officers were subject to some form of discipline. They were the only officers disciplined during an approximately one year period. Ms. Jones has

since been fired, and each of the other officers has resigned or refused to run for reelection.

7. Ms. Jones asked me, as a Union officer, if she was entitled to be paid for the detail on February 18, 2003. She was unable to reach that detail because of a snowstorm, but it was cancelled without the one and a half hours of prior notice required by the contract. It was my opinion that she was entitled to be paid since the contract provides for payment for details that are not cancelled in time and does not require the officer to appear. I told her that she was eligible to put in for the time.

8. A four hour minimum applies to details. Officers submit a detail slip. At the time there was no set way to put in for four hour minimum. You could write in the hours that the detail was supposed to run, for example 8 to noon, even if you were there for an hour. You could simply write in four hours. Officers, including myself, did it a number of ways. I have had details where I never went to them but was paid because of a late cancellation. Aside from Ms. Jones, I am unaware of anyone ever being disciplined or not paid for the minimum they were entitled to be paid for because of a late cancellation, nor am I aware of any officer ever being questioned or disciplined because they listed four hours at the detail rather than the hours they were actually present.

9. In my experience claims made for being injured on duty become common knowledge throughout the police department. Officers talk about who is injured and make fun of some of the injuries. Had Ms. Jones initially stated that she had injured her hand firing her weapon it would certainly have been the subject of jokes, particularly since it was common knowledge that she wanted to be a regular police officer. Ms. Jones showed me her hand, which was swollen, after the injury, and told me how it happened. She was concerned that people at the station would make fun of her.

10. I am not aware of any officer having difficulty taking time off for an on duty injury other than Ms. Jones. Officers sometimes put in notification after twenty four hours and on other cases take sick days and later have the time changed to injured on duty.

11. It is common practice to call the dispatcher if you want to take a holiday and ask them to look at the book to see if anyone else has taken time off. If enough people are working the dispatcher will tell you that you can take the day. The dispatchers will notify the sergeant on duty, but the officer requesting the time will not generally speak to the sergeant. I followed this practice recently when an officer called to see if he could take the day off.

12. At the time of Ms. Jones's injury an officer who was sick or injured would generally just notify the dispatcher and would take the day. It was not typical to speak to the officer in charge.

13. Union members are entitled to a $550.00 bonus if they use five or less sick days in a year. As a result officers will often ask to use other forms of leave instead of sick time. I have used comp time rather than take a sick day in order to preserve my right to a bonus.

Signed under pains and penalties of perjury.

January __, 2005

_____
Adam Hutton

Sent By: HPD;

since been fired, and each of the other officers has resigned or refused to run for reelection.

7.  Ms. Jones asked me, as a Union officer, if she was entitled to be paid for the detail on February 18, 2003. She was unable to reach that detail because of a snowstorm, but it was cancelled without the one and a half hours of prior notice required by the contract. It was my opinion that she was entitled to be paid since the contract provides for payment for details that are not cancelled in time and does not require the officer to appear. I told her that she was eligible to put in for the time.

8.  A four hour minimum applies to details. Officers submit a detail slip. At the time there was no set way to put in for four hour minimum. You could write in the hours that the detail was supposed to run, for example 8 to noon, even if you were there for an hour. You could simply write in four hours. Officers, including myself, did it a number of ways. I have had details where I never went to them but was paid because of a late cancellation. Aside from Ms. Jones, I am unaware of anyone ever being disciplined or not paid for the minimum they were entitled to be paid for because of a late cancellation, nor am I aware of any officer ever being questioned or disciplined because they listed four hours at the detail rather than the hours they were actually present.

9.  In my experience claims made for being injured on duty become common knowledge throughout the police department. Officers talk about who is injured and make fun of some of the injuries. Had Ms. Jones initially stated that she had injured her hand firing her weapon it would certainly have been the subject of jokes, particularly since it was common knowledge that she wanted to be a regular police officer. Ms. Jones showed me her hand, which was swollen, after the injury, and told me how it happened. She was concerned that people at the station would make fun of her.

10.  I am not aware of any officer having difficulty taking time off for an on duty injury other than Ms. Jones. Officers sometimes put in notification after twenty four hours and on other cases take sick days and later have the time changed to injured on duty.

11.  It is common practice to call the dispatcher if you want to take a holiday and ask them to look at the book to see if anyone else has taken time off. If enough people are working the dispatcher will tell you that you can take the day. The dispatchers will notify the sergeant on duty, but the officer requesting the time will not generally speak to the sergeant. I followed this practice recently when an officer called to see if he could take the day off.

12.  At the time of Ms. Jones's injury an officer who was sick or injured would generally just notify the dispatcher and would take the day. It was not typical to speak to the officer in charge.

13.  Union members are entitled to a $550.00 bonus if they use five or less sick days in a year. As a result officers will often ask to use other forms of leave instead of sick time. I have used comp time rather than take a sick day in order to preserve my right to a bonus.

Signed under pains and penalties of perjury.

January 12, 2005                                    Adam Hutton

# Deposition of Barry Mitchell
## August 31, 2004

1

Volume 1
Pages 1-146
Exhibits:  See index


UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10133-MEL

- - - - - - - - - - - - -

CAROLYN E. JONES,                  :
          Plaintiff                :
                                   :
                                   :
          v.                       :
                                   :
WILLIAM A. MASON, ET AL,           :
          Defendants               :

- - - - - - - - - - - - -


     DEPOSITION OF **BARRY MITCHELL**, taken on
behalf of the Plaintiffs, pursuant to the
applicable provisions of the Federal Rules
of Civil Procedure, before Carol A.
Fierimonte, Certified Shorthand Reporter
and Notary Public within and for the
Commonwealth of Massachusetts, (#134693),
at the Harwich Town Hall, 732 Main Street,
Harwich, Massachusetts, on Tuesday, **August
31, 2004**, commencing at 10:25 a.m.


CAROL A. FIERIMONTE
Certified Shorthand Reporter
101 Pond Plain Road
Westwood, MA 02090
(781) 762-4421    TELEFAX: (781) 326-7076

1    have a counseling or we will have an

2    informal counseling and then we will have

3    a letter of reprimand?  Anything that sets

4    out that policy?

5    A.    No.  That is something that I think is --

6    the best answer I can give you is the

7    Chief of Police has indicated that he

8    wants everybody to be treated fairly and

9    with justice.  As far as whether it is

10   spelled out specifically in those words, I

11   couldn't tell you.

12   Q.    Okay.  Is there -- do you have any

13   captains in the Department?

14   A.    Not anymore.  The position has been

15   eliminated.

16   Q.    So it goes from Sergeant to Lieutenant to

17   the Chief, is that correct?

18   A.    Yes.

19   Q.    All right.  Are you familiar with the term

20   "cruiser qualified"?

21   A.    Yes, I am.

22   Q.    What does that mean?

23   A.    It means an officer has had sufficient

24   experience and training to go out on

6    my attention that appeared to be

7    inappropriate.

8  Q.   Okay.   It is fair to say that many details

9    are short of four hours?

10 A.   I believe so, yes.

11 Q.   Okay.  People, the work is done, people

12    get sent home, is that correct?

13 A.   Right, yes.

14 Q.   You still bill for a minimum of four?

15 A.   Right.

16 Q.   And is the practice to put down four hours

17    on a detail slip?

18 A.   Actually, some officers will write out the

19    exact hours they were there and then make

20    note, in parentheses, four hour minimum.

21    Some officers just write four hours.   It

22    is probably half for each.

23 Q.   Okay.  All right.  Let me ask you about

24    this.  We call it the sick leave incident,

CAROL A. FIERIMONTE, CSR    (781) 762-4421

# Deposition of Edward H. Cronin
## August 31, 2004

1

Volume 1
Pages 1-50
Exhibits:  See index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10133-MEL

- - - - - - - - - - - - -
CAROLYN E. JONES,                :
        Plaintiff               :
                                 :
        v.                       :
                                 :
WILLIAM A. MASON, ET AL,         :
        Defendants              :
- - - - - - - - - - - - -

     DEPOSITION OF **EDWARD H. CRONIN**, taken
on behalf of the Plaintiffs, pursuant to
the applicable provisions of the Federal
Rules of Civil Procedure, before Carol A.
Fierimonte, Certified Shorthand Reporter
and Notary Public within and for the
Commonwealth of Massachusetts, (#134693),
at the Harwich Town Hall, 732 Main Street,
Harwich, Massachusetts, on Tuesday, **August
31, 2004**, commencing at 1:10 p.m.

CAROL A. FIERIMONTE
Certified Shorthand Reporter
101 Pond Plain Road
Westwood, MA 02090
(781) 762-4421     TELEFAX: (781) 326-7076

7

Q.   Okay.  As I understand it, both you and
     she were scheduled to work a detail.  Is
     that correct?

A.   Yes, it was.

Q.   And do you recall the time that it was
     supposed to start?

A.   I believe it was seven to three.

Q.   And do you recall where it was?

A.   It was under the Route 6 on Depot, Depot
     Street.

Q.   Now --

A.   Depot Road.  Excuse me.

Q.   Do you recall that there was a snowstorm
     that night before into the morning?

A.   Yes, there was.

Q.   Okay.  Do you -- strike that.  Did you
     know whether the detail was canceled?

A.   Well --

Q.   Tell me what happened that morning.  Let's
     just walk through it.  What happened that
     morning?

A.   Yes.  I woke up that morning.  There was,
     obviously, I think, my best recollection
     is about 23 inches of snow.  We -- I woke

11

A.  I couldn't recall.  It was, obviously, the
    amount of snow, it was of great concern.

Q.  So when you said you had spoken to
    Sergeant Jacek and you had to come in,
    what did Ms. Jones say?

A.  She wasn't happy about it.

Q.  Did she say anything about trying to get
    in?

A.  Not that I recall.

Q.  Did she say anything about having
    difficulty getting in?

A.  No, she didn't.

Q.  What did you do after that?

A.  I drove in.

Q.  And do you recall about what time you got
    in?

A.  Somewhere around seven.

Q.  Okay.  And a little after, a little
    before?

A.  I think right about seven.

Q.  And what did you do then?

A.  I reported to Sergeant Jacek.  And
    Sergeant Jacek advised me to hold off.  He
    didn't want me to drive out and hurt a

12

1    cruiser.  So he told me to why don't you

2    just hang on and we will send one of the

3    cars that was already out to see, examine

4    whether the detail is going on or not.

5  Q.  Okay.  And did he say anything about them

6    trying to reach the person who scheduled

7    the detail or --

8  A.  I believe they tried.

9  Q.  Okay.  Did he say anything about them

10    trying to reach the State Police?

11  A.  It wasn't a State Police detail.  It was a

12    private detail.

13  Q.  Okay.  Weren't there also State Police

14    scheduled for that detail that day?

15  A.  Not that day.

16  Q.  Okay.  All right.  So did you stay at the

17    station for some period of time?

18  A.  Yes, I did.

19  Q.  And what did you do there?

20  A.  Cleaned the cruisers off that had snow on

21    them.

22  Q.  What is the next thing that happened that

23    you recall?

24  A.  Sergeant Jacek leaves at 7:30 so I then

13

```
1         was basically under the command of
2         Sergeant Sayers, S-A-Y-E-R-S.
3    Q.   And did you discuss the matter with
4         Sergeant Sayers?
5    A.   Yes, I did.
6    Q.   And what was that conversation?
7    A.   He didn't want a cruiser to go out there
8         until he thought the roads were safe.
9    Q.   Okay.  So the roads were not safe at that
10        point?
11   A.   He wanted to make sure -- I couldn't -- I
12        couldn't tell you.  I mean I drove in.
13        But he didn't want a cruiser to go out
14        there.
15   Q.   So Sergeant Sayers' statement to you was I
16        don't want another cruiser out there until
17        the roads are safer?
18   A.   He wanted me to hold off.
19   Q.   Did he say something about let's wait
20        until the roads are safer?
21   A.   He had me in kind of a holding pattern.
22   Q.   Did he say something about waiting until
23        the roads are safer?
24   A.   Again, it -- he could have.  You know, it
```

14

1    was basically he didn't want a cruiser to

2    go out there until we determined whether

3    we were going to have a detail or not.  He

4    basically reiterated what Sergeant Jacek

5    said.

6    Q.    So that is around 7:30 when Sergeant

7          Sayers comes on, is that correct?

8    A.    He comes on, he is in the building at

9          seven.  They have an overlap of about a

10         half hour.  But Sergeant Jacek is gone

11         about 7:30, 7:35.

12   Q.    So what is the next thing that happens?

13   A.    Eventually, I got the green light to go

14         out.

15   Q.    And what time was that?

16   A.    I would say it was close to 8:30.

17   Q.    Okay.  And who made that decision?

18   A.    Sergeant Sayers.

19   Q.    And what were you doing in the meantime

20         besides -- after the cruisers were cleaned

21         off?

22   A.    I was in the station kind of mulling

23         around.

24   Q.    Still at Sergeant Sayers' direction?

18

A.   I just specifically remember calling her under the direction of Dispatcher Clough, C-L-O-U-G-H.

Q.   And how far is it to the site from the station by time?

A.   Seven minutes.

Q.   Okay.  And you went out to the site around 8:30, is that your recollection?

A.   Yes.

Q.   And what did you do when you got to the site?

A.   Right as I got to the site, as I hit Depot Road, Dispatcher Clough called up and said that the detail was canceled.

Q.   Okay.  All right.  Did you actually reach the site or was it a little before, a little after you got there?

A.   I was on Depot Road, about -- I was right about at the site.

Q.   So just a little bit short, she calls you, you turn around?

A.   I was right there.

Q.   Okay.  Could you actually see the site from where you were?

1  A.  From Depot Road, yes, the bridge.

2  Q.  Was there anything there, anything going

3      on?

4  A.  It was a construction site, you know.

5  Q.  Nobody working that day, right?

6  A.  I didn't see anybody there.

7  Q.  You probably weren't surprised, right?

8      Did you expect to see anybody working?

9  A.  I can't recall.

10  Q.  Okay.  A cruiser had gone by earlier,

11      correct?

12  A.  Say it again.

13  Q.  A cruiser had gone by earlier that day, is

14      that correct?

15  A.  I don't know.

16  Q.  You don't recall one way or the other?

17  A.  No.

18  Q.  I thought they said they were going to

19      send one of the cruisers that was out to

20      check out the scene.

21  A.  Yes.  But I never recall anybody coming

22      back and say that they did.

23  Q.  So did you ever get out of the car at the

24      site?