20

1   A.   No.

2   Q.   So pretty much as soon as you get close,

3        you get the call from the dispatcher, you

4        turn around and come back to the station?

5   A.   That is what I did.

6   Q.   Okay. And then did you go home?

7   A.   I can't recall.

8   Q.   Okay. You were there for a detail, you

9        weren't working that day, correct?

10  A.   Yes. My assignment was for the detail.

11  Q.   As long as the detail was canceled, you

12       are free to leave. Is that fair?

13  A.   Yes, I am.

14  Q.   You are entitled to the four-hour minimum,

15       is that your understanding?

16  A.   Yes, I am.

17  Q.   Is that -- and that is in the contract as

18       far as you know, collective bargaining

19       agreement?

20  A.   It is -- the cancellation is. If it is a

21       seven o'clock detail, they have until 5:30

22       to cancel.

23  Q.   If they cancel after 5:30, if the detail

24       is canceled after 5:30, you are entitled

CAROL A. FIERIMONTE, CSR   (781) 762-4421

23

```
 1        you a start time and an end time, then a
 2        tally of the amount of hours you worked.
 3   Q.   Okay.  So that start and end time, you put
 4        down the total?
 5   A.   Yes.
 6   Q.   And do you know what you put on the slip
 7        that day?
 8   A.   No, I don't.
 9   Q.   Have you ever looked at it again?
10   A.   No.
11   Q.   Has anybody ever asked you to see it?
12   A.   No.
13   Q.   You know that C.J. was investigated by
14        Lieutenant Mitchell regarding this
15        incident?
16   A.   I know she was investigated.
17   Q.   Okay.  I take it from that answer nobody
18        told you directly that she was being
19        investigated?
20   A.   I was investigated so --
21   Q.   Okay.  Tell me about that investigation.
22   A.   I was -- Lieutenant Gagnon, within a week,
23        had contact with me and just asked me what
24        had happened in regards to myself.
```

CAROL A. FIERIMONTE, CSR    (781) 762-4421

27

1        you --

2    Q.    Sure.  It is the way I asked you.  I asked

3        you have you now told me everything you

4        recall about your conversations with Ms.

5        Jones, and you said no.

6    A.    To the best of my recollection, I have

7        told you everything I know about my

8        interaction with her, yes.

9    Q.    Did you ever -- so later on you were asked

10       about this by Lieutenant Gagnon and by

11       Lieutenant Mitchell.  Did you ever speak

12       with Ms. Jones about anything?

13    A.    I don't recall.

14    Q.    Did you ever speak with anyone else other

15       than Lieutenant Gagnon and Lieutenant

16       Mitchell?

17    A.    Not that I recall.

18    Q.    Now, you know that -- let me ask you this.

19       To the best of your recollection, you put

20       down seven to 11 on your time slip?

21    A.    I don't know what I put down on my time

22       slip.

23    Q.    Did anyone ever criticize you for the way

24       you filled out those detail slips?

28

A.   I have never been criticized.

Q.   You indicated before you have always been
     told it is okay to just put down the time
     that the detail is listed for.

A.   If it is a minimum, if the situation you
     say, it doesn't matter what the start time
     and end time is as long as you put your
     four hours down and your start time.

Q.   Okay.  I am going to ask you the question
     again just so the record will read
     clearly.  It is your understanding that if
     you go to a detail and you wind up being
     there for less than four hours but you are
     entitled to the minimum of the four, it
     doesn't really matter what times you put
     down, as long as you just put down the
     four hours.  Is that what you are telling
     me?

A.   Karen Young just told me the total is what
     she looks for.

Q.   Did Karen Young tell you at all how to
     fill out the slip?

A.   No.  No one ever taught me how to fill out
     one of these.

29

Q.   But you had a conversation with Karen
     Young about it at some point?

A.   I have always -- she basically runs the
     station and she basically, anything I do,
     if I think it is a question, I ask her.

Q.   Okay.  So at some point you spoke with her
     about how to fill it out?

A.   How to fill out detail slips, a time slip.

Q.   Okay.  And did she give you any
     instructions about how to fill out the
     time slip when you were just getting the
     minimum of four?

A.   I -- no.  I can't recall.  I --

Q.   Okay.  So is it your custom you usually
     put down the hours that it was scheduled
     for?

A.   Yes.

Q.   And then list the four?

A.   And then list the four.

Q.   Would Ms. Young know one way or the other
     whether it was a detail that people got
     the minimum of four or whether they were
     actually there four hours?

A.   I don't know.  I have no idea.  You would

30

1     have to ask her.

2   Q.  Now, there has been an allegation that Ms.

3     Jones suggested to you something about her

4     putting in that she was there at the

5     detail or saying that she was there at the

6     detail even though she wasn't there.

7   A.  There was an allegation?

8   Q.  There was an allegation that has been

9     made.  Do you recall that she made any

10     such statement by her?

11  A.  No.

12  Q.  Did you at any time suggest that she just

13     put in for saying that she was there?

14  A.  Not that I recall, no.

15  Q.  Okay.  Have you become aware that she put

16     in for a time slip or a detail slip for

17     those four hours?

18  A.  I had eventually become aware of it, yes.

19  Q.  Are you aware of anyone that has

20     complained about her putting in a detail

21     slip for those four hours?

22  A.  Today, I do, yes.  I mean I -- eventually,

23     yes.

24  Q.  Okay.  Well, who?

# Deposition of Robert C. Brackett, Jr.
## August 31, 2004

1

Volume 1
Pages 1-18
Exhibits:  See index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10133-MEL

- - - - - - - - - - - - -
CAROLYN E. JONES,                  :
        Plaintiff                  :
                                   :
        v.                         :
                                   :
WILLIAM A. MASON, ET AL,           :
        Defendants                 :
- - - - - - - - - - - - -

        DEPOSITION OF **ROBERT C. BRACKETT, JR.**,
taken on behalf of the Plaintiffs,
pursuant to the applicable provisions of
the Federal Rules of Civil Procedure,
before Carol A. Fierimonte, Certified
Shorthand Reporter and Notary Public
within and for the Commonwealth of
Massachusetts, (#134693), at the Harwich
Town Hall, 732 Main Street, Harwich,
Massachusetts, on Tuesday, **August 31,
2004**, commencing at 2:20 p.m.

                CAROL A. FIERIMONTE
        Certified Shorthand Reporter
             101 Pond Plain Road
             Westwood, MA 02090
    (781) 762-4421      TELEFAX: (781) 326-7076

8

```
 1   A.   The Chief's secretary.  It goes into a box

 2        that is monitored by the Chief's

 3        secretary.  She collects them.

 4   Q.   Okay.  Is that Karen Young?

 5   A.   Yes.

 6   Q.   Now --

 7   A.   Or in her absence, a replacement, one of

 8        the other secretaries.

 9   Q.   Okay.  When you do a detail that turns out

10        to be less than four, you get the minimum

11        of four, how do you fill that out?  How do

12        you fill the slip out?

13   A.   There is no standard way.

14   Q.   Okay.  Do you have a practice or I mean is

15        there a typical way you do it yourself?

16   A.   Do I?

17   Q.   Yes.

18   A.   I generally put the hours that I work.  It

19        gives a start time and end time.

20   Q.   Yes.

21   A.   And then a total hours.  And this is

22        again, we don't -- I don't -- I don't know

23        what the policy is for filling out the

24        exact thing.  I can only comment on how I
```

# <u>Deposition of Chief William A. Mason</u>
## August 26, 2004

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No: 04-10133-MEL
Pages 1 to 171
Volume I

_____

CAROLYN E. JONES,                    )
      Plaintiff,                     )
                              )
      -vs-                           )          COPY
                              )
WILLIAM MASON, CHIEF OF             )
POLICE HARWICH POLICE DEPARTMENT,)
and the TOWN of HARWICH            )
      Defendants.                    )
_____


        DEPOSITION of CHEIF WILLIAM A. MASON, called
on behalf of the Plaintiff, pursuant to the applicable
Rules Civil Procedure, taken at the Town offices of
Harwich Town Offices, Harwich, Massachusetts, duly
sworn before Lisa Lee Gross, Notary Public for the
Commonwealth of Massachusetts, on Thursday,
August 26, 2004, at 3:00 p.m.


APPEARANCES:
LAW OFFICES OF TIMOTHY M. BURKE
BY:  Brian J. Rogal, Esq.
Needham Corporate Center
160 Gould Street
Suite 111
Needham, Massachusetts 02494
For the Plaintiff.

GILMAN HOLTZ, P.C.
BY:  Robert J. Van Campen, Esq.
     Michael Gilman, Esq.
25 New Chardon Street
Boston, Massachusetts 02114
For the Defendants.

1    Q.   Is there any memo in his file?

2    A.   No.

3    Q.   Why not?

4    A.   Why?  Because that was an inappropriate

5    conversation, rather than a fraud, for showing

6    up -- for attempting to get paid for a job you

7    never showed up to.

8    Q.   So he suggested that Ms. Jones lie about

9    what she did, you don't consider that to be an

10   inappropriate conversation?

11            MR. VAN CAMPEN:   Objection.

12   A.   I didn't say that.

13   Q.   You didn't -- don't consider that to be

14   a suggestion of fraud?

15   A.   (No response.)

16   Q.   Is there an answer, sir?

17   A.   I do not consider that as egregious --

18   as I said, Lieutenant Mitchell counseled the

19   employee.

20   Q.   The question to you, Officer Cronin

21   suggests to Ms. Jones, "...just say you came

22   in and left."  Now, that's a predicate to

23   putting in a slip that says you were there,

24   you don't consider that to -- him advising her

1    to commit a fraud?

2    A.   I think that is inappropriate activity.

3    Q.   And what discipline did he receive for

4    that?

5    A.   He was counseled by Lieutenant Mitchell.

6    Q.   And you are satisfied with that

7    discipline?

8    A.   That particular aspect of it, under the

9    circumstances, yes.

10    Q.   Let's leave that topic and find another

11    one, your counsel would say.

12    Do you have any concern or problem

13    with Ms. Jones' use of sick leave?

14    A.   In general?

15    Q.   In general.

16    A.   No.

17    Q.   Now, Ms. Jones allegation that she hurt

18    her hand while she was at the range?

19    A.   Yes.

20    Q.   You are aware of that?

21    A.   Yes.

22    Q.   On or about April 15th 2003, correct?

23    A.   Yes.

24    Q.   Do you have any reason to believe that

1    she didn't hurt her hand in that fashion?

2        A.    With the information that I have now?

3        Q.    Yes?

4        A.    No.

5        Q.    Okay.  The information that you had, at

6    any time did you have any reason to believe

7    that she hasn't actually hurt her hand?

8        A.    No.

9        Q.    Do you have any reason to believe --

.0        A.    Wait a minute, counselor, at any point?

11        Q.    Yes.

12        A.    Yes.

13        Q.    When?

14        A.    At one point I did.

15        Q.    When was that?

16        A.    That was the day that Lieutenant

17    Mitchell made the contact with Ms. Jones to

18    advise her that she was under investigation

19    for the sick leave issue.

20        Q.    How long after was she -- April 15th,

21    how long after that date?

22        A.    Do you mind if I check my notes?

23        Q.    No.

24        A.    Counsel, I'm sorry, I thought I had that

1      Q.   After that?

2      A.   After that, after that date of April

3      23rd, not until I got the information -- I was

4      -- I doubted it until I got the information

5      from the town physician, Dr. Minor.

6      Q.   And after you received -- what did you

7      get from him?

8      A.   A report that talked about gatekeepers

9      thumb.  Which is an injury that is frequently

10     connected with a repetition of the recoil of a

11     hand gun.  I particularly appreciated Dr.

12     Minor's opinion, simply because he was a

13     military doctor who had a background in those

14     types of injuries.

15     Q.   Had you heard the term before,

16     gatekeepers thumb?

17     A.   Never heard of it before.

18     Q.   After that did you have reason to doubt

19     that Ms. Jones had suffered an injury at the

20     range?

21     A.   No.

22     Q.   You agreed that if she injured her hand

23     at the range, that it would be job related?

24     A.   Yes.

1    Q.   Did you ask her to see the town doctor?

2    A.   Yes, I did.

3    Q.   Previously to that she had provided some

4    emergency room records, she had seen a doctor

5    at the Cape Cod Hospital?

6    A.   I believe the sequence of events was,

7    that she did see a doctor at the Cape Cod

8    Hospital, and then she was referred to the

9    town physician.

10   Q.   Was she requested or required to seek

11   any other medical opinion?

12   A.   Not that I recall.  That I ordered.  Dr.

13   Minor may have ordered something, but nothing

14   that I recalled requesting.

15   Q.   So at the time you received Dr. Minor's

16   report, you were satisfied she had an injury,

17   that it was job related, and that there -- it

18   was likely job-related?

19   A.   Yes.

20   Q.   And were you satisfied at that point

21   that that precluded her from working?

22   A.   Dr. Minor's report said that she was

23   unable to work because of the repetitive

24   motion of her thumb.

1          AMERICAN ARBITRATION ASSOCIATION

2                              No:  11 390  01615  03
                               Pages 1 to 338
3

4      ------------------------------------
       IN RE:  CAROLYN JONES
5      and THE TOWN OF HARWICH
       ------------------------------------
6                                         COPY

7                    *  *  *  *  *  *  *

8

9              Date:  Tuesday, August 3, 2004
               Time:  10:30 a.m.
10             Held at: Harwich Town Hall
               Harwich, Massachusetts
11             Before:  Michael W. Stutz, Esq.
                        American Arbitration Association
12

13

14     APPEARANCES:
       LAW OFFICES OF TIMOHTY M. BURKE
15     BY:  Timothy M. Burke, Esq.
            Brian Rogal,Esq.
16     Needham Corporate Center
       160 Gould Street
17     Suite 111
       Needham, Massachusetts 02494
18     For Carolyn Jones.

19     GILMAN HOLTZ, P.C.
       BY:  Michael Gilman, Esq.
20     25 New Chardon Street
       Boston, Massachusetts 02114
21     For The Town of Harwich.

22
       ALSO PRESENT:    Carolyn E. Jones
23                      Adam Hutton, Union President
                        Lt. Barry Mitchell
24

```
 1

 2                              I N D E X

 3     Union Witness:          Direct   Cross   Redirect  Recross
       FIRE CHIEF ROBERT PETERSON
 4     (by Mr. Rogal)            29       39
       (by Mr. Gilman)                    36
 5


 6
       Town of Harwich:        Direct   Cross   Redirect  Recross
 7     LT. BARRY MITCHELL
       (by Mr. Gilman)          40                66
 8     (by Mr. Rogal)                    54                 68

 9


10     Town of Harwich:        Direct   Cross   Redirect  Recross
       THOMAS GAGNON
11     (by Mr. Gilman)          70               99,108
       (by Mr. Burke)                    81                103
12


13
       Town of Harwich:        Direct   Cross   Redirect  Recross
14     EDWARD CRONIN            109               136
       (by Mr. Gilman)
15     (by Mr. Burke)                   116                138

16


17     Town of Harwich:        Direct   Cross   Redirect  Recross
       ROBERT BRACKETT         139               154
18     (by Mr. Gilman)
       (by Mr. Burke)                   148                159
19


20


21     Town of Harwich:        Direct   Cross   Redirect  Recross
       CHIEF WILLIAM A. MASON
22     (by Mr. Gilman)          162              202, 223
       (by Mr. Rogal)                   166                212
23


24
```

3

1

2                                I N D E X

3    Union Witness:          Direct   Cross   Redirect  Recross
     CAROLYN E. JONES
4    (by Mr. Rogal)            226                289
     (by Mr. Gilman)                    263
5

6    Union Witness:          Direct   Cross   Redirect  Recross
     ADAM HUTTON
7    (by Mr. Rogal)            290
     (by Mr. Gilman)                    301
8

9

10

11

12
     REBUTTAL WITNESS:
13   CHIEF MASON             Direct   Cross   Redirect  Recross
     (by Mr. Gilman)           311
14   (by Mr. Rogal)                    313

15

16
     REBUTTAL WITNESS:       Direct   Cross   Redirect  Recross
17   CAROLYN E. JONES
     (by Mr. Rogal)            331
18

19
     REBUTTAL WITNESS:       Direct   Cross   Redirect  Recross
20   ADAM HUTTON
     (by Mr. Rogal)            332
21

22

23

24

1    Q.   You knew it before this supposed
2    conversation in December of 2003, that she
3    blamed you in part for her termination?
4    A.   We had not had any conversation to that
5    effect.
6    Q.   You are not friends with her?
7    A.   I -- at that point -- as I said, we were
8    friends, but after she was terminated, quite
9    naturally, the relationship cooled.
10   Q.   Now, you -- all right.
11            How long had it been since you had
12    seen her before that time?
13   A.   Like I said, she had been around the
14   house.  She did some yard work for Dave.  I
15   just -- I just saw her in passing.
16   Q.   No conversations?
17   A.   I might have waved.  She might have
18   nodded back.  That was about the extent of it.
19   No real conversation.
20   Q.   And you don't know who this guy was that
21   intimidated you?
22   A.   I wasn't intimidated.  But I have since
23   learned the identity of the person who
24   accosted me.

1    is that correct?

2        A.   No, it does not.

3        Q.   In fact, you never had a conversation

4    with her in which her probationary status was

5    discussed?

6        A.   No.  We discussed seniority.

7        Q.   You never had a conversation with Ms.

8    Jones when she was hired back as a dispatcher

9    in which a probationary status was discussed,

10   right?

11       A.   Like I said --

12       Q.   Did you understand my question?  This is

13   a yes or no question.

14       A.   I don't believe it is, sir.

15       Q.   Did you ever have a conversation, prior

16   to this Christmas party of 2003, in which Ms.

17   Jones probationary status was discussed with

18   her?

19       A.   Not prior to it, no.

20       Q.   Okay.  You didn't tell her she was going

21   to be on probation, correct?

22       A.   Correct.

23       Q.   You didn't discuss whether she would not

24   be on probation?

1          A.   Correct.

2          Q.   It never came up?  Correct?

3          A.   The term new hire was the only phrase --

4          Q.   Sir, did you understand my question?

5          A.   Yes, I did, and I'm trying to clarify.

6          Q.   Answer the question.

7               Did the term probation -- it never

8       came up, never came up, did it?

9          A.   No it never came up.

10         Q.   It never came up with the chief, either,

11      did it?

12         A.   Sorry, I didn't --

13         Q.   You said that you went back and forth

14      with the chief, or at least you went to the

15      chief about her being hired?

16         A.   Yes.

17         Q.   And you discussed seniority, correct?

18         A.   That's correct.

19         Q.   And the contract with the officers has a

20      provision for embracing seniority after six

21      months, correct?

22         A.   We didn't discuss the contract.  I

23      discussed what she had asked me.

24         Q.   You just asked the chief about whether

1    she would have seniority, correct?

2        A.    Yes.

3        Q.    And the chief said no, no seniority,

4    correct?

5        A.    That wasn't his full reply, no.

6        Q.    Did he say that?

7        A.    That was part of it.

8        Q.    Did he say she was going to be a new

9    hire?

10       A.    Yes, he did.

11       Q.    But never mentioned the word

12   "probation"?

13       A.    Not to me.

14              MR. ROGAL:  May we just have a

15   moment.

16                   (Pause.)

17              MR. ROGAL:  Nothing further.  Take

18   that back.

19           BY MR. ROGAL:

20       Q.    Your affidavit doesn't use the word

21   probation, right, doesn't reflect in any way

22   any discussion ever of a conversation with the

23   chief or with Ms. Jones about her going back

24   in some kind of a probation designation?

```
 1        A.   I don't recall saying that, no.

 2        Q.   Would you like to look at that?

 3             (Witness reviews document.)

 4        A.   No mention of probationary.

 5        Q.   Is your affidavit signed on August 6th

 6   of 2003, correct?

 7        A.   Yes.

 8        Q.   And in aide of the town's effort to

 9   enjoin this arbitration, correct?

10        A.   Yes.

11             MR. ROGAL:  And I move this into

12   evidence.

13             MR. GILMAN:  No objection.

14             THE ARBITRATOR:  Okay.  We will mark

15   it Union Exhibit 1.

16                  (Union Exhibit 1

17                  marked for identification.)

18             MR. ROGAL:  Nothing further for this

19   witness.

20             MR. GILMAN:  Can I borrow that for a

21   minute.

22        REDIRECT EXAMINATION BY MR. GILMAN:

23        Q.   Lieutenant, you have been a member of

24   the department for 25 years?
```

1      Q.   At some point she resigned her position
2   as a dispatcher?
3      A.   Yes.   I'm aware she resigned her
4   position.
5      Q.   And was there any point in time after
6   that when she spoke to you about returning to
7   the department?
8      A.   Yes.   We had several conversations about
9   when a position became available, we had
10   several conversations that there was a
11   position available.
12      Q.   Did she have any interest in a police
13   officer's position?   Did she ever express that
14   to you?
15      A.   Yes.   We had -- we had conversation
16   during -- we have had many conversations.   She
17   expressed interest in -- at some point to
18   become a police officer.
19      Q.   And bringing you up to the time that she
20   was hired as a full-time dispatcher in
21   December of 2002, did you have any
22   conversation with her at that time about the
23   terms and conditions of her employment?
24      A.   We met in my office, with Officer Hutton

1      one day, and I can't recall if she was asked

2      to come in or she and Adam just showed up.

3      And we spoke about the position.

4                  She made an inquiry regarding

5      seniority, her pay.  And that was the part --

6      that was all part of that conversation.

7          Q.   And the position that you referenced,

8      was the full-time dispatch position?

9          A.   Yes.

10         Q.   Were you able to answer her questions

11     regarding her seniority and pay?

12         A.   After speaking with Chief Mason I was,

13     yes.

14         Q.   And what was it you then told Ms. Jones

15     about that?

16         A.   I was told that she would not be able to

17     get her seniority back.  That she was coming

18     onboard as a new employee, but that we would

19     try to, at the time, start her at step level

20     3, I believe it was, on the pay scale.

21         Q.   Do you know what the rationale for

22     starting her at a higher step was?

23         A.   Yes.  Because she had the experience and

24     the training, and we would not have to do

1     that, like with somebody else.

2              She was coming back.  She was trained

3     in the dispatch, so we won't have to do that.

4     So we -- it was a suggested, or attempted for a

5     level 3.  Or subsequently the chief called

6     me -- I can't remember if it was a day -- a day

7     later or that same day.  And then I called Ms.

8     Jones or -- I either called her or Officer

9     Hutton's cell phone, I can't remember which

10    one, and explained that -- I spoke with her, it

11    would have to be step level 2.  And she agreed

12    with it.

13    Q.   Now, at the time that she was rehired,

14    was she working as a special officer for the

15    Town of Harwich?

16    A.   I believe she was.

17    Q.   And do you know how her rate of pay as a

18    special officer related to how she was going

19    to get paid as a dispatcher?

20    A.   The only thing I knew, make sure she was

21    not going to get -- be compensated less as a

22    dispatcher then as a special officer.

23    Q.   By that you mean if step 1 dispatch pay

24    is less than her rate as a dispatcher, there