1          Q.    You wanted to prep yourself for your

2     testimony today?

3          A.    It -- there wasn't a lot to prepare for,

4     but yes.

5          Q.    Does the word, or the words

6     "probationary period," appear anywhere in your

7     affidavit?

8          A.    No, it does not.

9          Q.    And you know when I talk about that,

10    that's an operative word, "probation," and

11    there's nothing in here about you telling her

12    that he is on a probation status?

13         A.    That's correct.

14         Q.    And you never ever told her, when you

15    had that meeting with Adam Hutton, "Listen, in

16    addition to your not getting seniority, you

17    are still going to be on a probationary

18    status"?

19         A.    I can shorten this.  I never brought up

20    the word probation.

21         Q.    I get paid by the minute so, so I can

22    drag it out.  But I appreciate your candor.

23    So that never happened?

24         A.    No.

1      evaluation?

2          A.   If somebody received an evaluation, I

3      know some evaluations have been done, the

4      supervisory files like that, that I am aware

5      of, but if somebody received a, just all

6      negative evaluation during that time, I

7      believe that would be grounds for the step

8      increase not to occur.  But I have not known

9      that to occur.

10         Q.   Anyway, she got the step raise?

11         A.   Yes, she did.

12         Q.   So you had the conversation about

13     seniority -- and by the way, you have to go to

14     the town hall and get that straightened out

15     over there?

16         A.   Not those exact words, but that's the

17     gist of it, yes.

18         Q.   And to be clear, you did not tell her

19     she as on probation; and there is nothing in

20     writing which you gave her that told her she

21     was on probation a second time; and the chief

22     didn't tell you she was on probation, and you

23     certainly didn't tell her that the chief told

24     you that she was on probation; is that

1       correct?  That's a good one.

2            A.   I believe if I follow all that out

3       correctly, that is correct.

4            Q.   So she leaves there and nobody says,

5       "Oh, by the way, you are on probation"?

6            A.   No.  I believe that -- I believe I made

7       it clear in my own mind by saying, "You are a

8       new employee."  I did not say on probation.

9            Q.   And you --

10           A.   And I never signed anything saying

11      probationary.

12           Q.   So the police department is down there

13      (indicating), she comes over here to town

14      hall?

15           A.   Yes.  I don't know when she came to the

16      town hall.

17           Q.   You know she is a new hire, so --

18           A.   I know the insurance forms or whatever.

19           Q.   Have you had a chance to see Exhibit 19?

20           A.   I have not seen any exhibits.

21           Q.   So you don't know, you cannot tell us

22      whether or not the information that she gets

23      from the town when she gets hired the second

24      time, say, oh, by the way, you are a

```
1         yes, I have been.
2              Q.   Because you had a chance to see
3         everything in writing, right?  You read it?
4              A.   I did.
5              Q.   It's in writing?
6              A.   I was made aware of it, and then -- and
7         then I read it.
8              Q.   Sir, as an administrative lieutenant and
9         the person of how many years experience?
10             A.   18 plus.
11             Q.   Do you have any document in your
12        possession, or are you aware of any document
13        which informs Carolyn Jones in writing that
14        she was subject to a second probationary
15        period of one year?
16             A.   Anything in writing, no.
17             Q.   Now, Carolyn Jones never discusses
18        probation with you?
19             A.   No.  Not that I'm aware of.
20             Q.   Certainly, sir, given the significance
21        of her probationary status, that's something
22        that you would have remembered if, if Carolyn
23        Jones had come up and discussed her probation
24        with you, right?
```

1      A.   I would imagine I would.  I don't
2    recall.
3      Q.   I just want to focus.
4      A.   I don't recall ever having a
5    conversation with her approaching me on
6    probation.
7           MR. BURKE:   Thank you, sir, nothing
8     else.
9         REDIRECT EXAMINATION BY MR. GILMAN:
10     Q.   What was the reason that you sent Ms.
11   Jones to town hall when she was being rehired?
12     A.   Sorry.
13          THE ARBITRATOR:   What was the reason
14    you sent Ms. Jones to town hall when she was
15    being rehired?
16     Q.   What was the reason you were sending her
17   to the town hall?
18     A.   Insurance papers, stuff like that, the
19   -- and similar -- whatever they would have to
20   do for a new employee.  I'm not sure.
21          I just know that you have to go to
22    town hall.  Insurance.  But I was not aware of
23    any other forms.  I know there were -- there
24    are other forms, but I don't know -- I had only

1       Q.   She is pretty active, wasn't she?

2       A.   Yeah.  I mean --

3       Q.   She bitched to a lot of people about

4    things, didn't she?

5       A.   A lot of people seemed to do.

6       Q.   We are not talking about them.  Focus on

7    her.

8       A.   I don't know what she -- she bitched to

9    plenty of people in management about things

10    she didn't like in the union, or what

11    management was doing.  She was usually telling

12    me to shut up, so I don't know what she --

13       Q.   In addition to what your personal

14    conversation was, and focus on the question.

15       A.   I don't know what she actually

16    officially complained about.  I don't pay

17    attention to it.  But yes, she voiced her

18    concerns.

19       Q.   She was not a shrinking violet, was she?

20       A.   No.

21       Q.   And there are issues for the secretary

22    of the union, and people knew she couldn't be

23    to probation, and so she didn't have a problem

24    talking about it, right?

```
1         Q.   And you are chief of the Harwich Police
2    Department?
3         A.   Yes, I am.
4         Q.   And have been since when?
5         A.   June 22nd 2000.
6         Q.   And do you recall a situation concerning
7    Ms. Jones and the work -- the working of a
8    paid detail, or a paid detail assignment?
9         A.   Yes, I do.
10        Q.   And when did that issue arise?
11        A.   I believe it was sometime in February of
12   2003.
13        Q.   And did you cause that particular
14   situation to be investigated?
15        A.   Once the facts of the investigation were
16   brought to my attention, I then ordered an
17   investigation to ensue.
18             THE ARBITRATOR:  Wait a minute.  Once
19        the facts of the evidence --
20             THE WITNESS:  Excuse me.  Once the
21        facts of the issue were brought to my
22        attention.
23             THE ARBITRATOR:  I had a feeling you
24        misspoke.  Okay.
```

1       Q.   Now, where do you live?

2       A.   Hyannis.

3       Q.   Ms. Jones, at some point you applied to

4    become a dispatcher?

5       A.   Yes.

6       Q.   With Harwich?

7       A.   Yes.

8       Q.   And also applied with another town?

9       A.   Chatham.

10       Q.   When was that?

11       A.   1999 -- 1998.

12       Q.   Were you hired by anyone?

13       A.   I was hired by both.

14       Q.   In what order?

15       A.   Chatham offered me the first position.

16       Q.   Did you accept?

17       A.   I did.

18       Q.   And then what happened?

19       A.   Chief Greenwood, at the time, for

20    Harwich called and offered me a job with

21    Harwich.  And I felt that I had already

22    accepted Chatham, but to please keep me in

23    mind.

24       Q.   Did you go through an application

1      process here in Harwich?

2          A.   Yes.

3          Q.   And did you fill out some forms for

4      them?

5          A.   Yes.

6          Q.   Any discussion about probationary

7      periods?

8          A.   When I was first hired?

9          Q.   Yes.  Back in February of 1999, when you

10     were first applied.

11         A.   Yes.

12         Q.   What was that discussion?

13         A.   That I had to complete 12 months of

14     probationary.  They went through all the

15     paperwork with insurance, explained what I

16     needed to do and how I'd complete it and --

17     and I signed off on it.

18         Q.   And there's a form here that's been

19     attached to both Joint Exhibit 9 and Joint

20     Exhibit 10, did you sign that form?

21         A.   Yes.

22         Q.   There's an explanation about probation

23     status?

24         A.   Correct.

1    Q.  You had to get that notarized?

2    A.  I did.

3    Q.  And who explained that to you?

4    A.  Who explained the forms to me?

5    Q.  Yes.

6    A.  Town hall, and I believe either

7    lieutenant Gomes or Captain Welch.

8    Q.  So you understood that being hired at

9    that point, in 1998, that you would have a 12

10   month probation period?

11   A.  Yes.

12   Q.  And you went to work for Chatham, and

13   you -- you eventually came to work for

14   Harwich; how did that come about?

15   A.  Actually, Chief Greenwood called.  I had

16   a couple of people from Harwich call me that

17   were, I believe, on the hiring board.  I had

18   been with Chatham for a while.  And

19   occasionally officers would call and ask if I

20   was happy, and would I be interested in coming

21   over to Harwich.  And eventually they offered

22   me some benefits that I wouldn't receive in

23   Chatham, so I put in my notice with Chatham,

24   and moved over to Harwich.

```
1        Q.   Who made those offers to you?
2        A.   Chief Greenwood.  Ultimately he -- I
3    talked to several people.
4        Q.   What point were you offered a job here
5    in Harwich again?
6        A.   I had been in Chatham for a year.
7        Q.   And did you meet with anyone here in
8    Harwich when they offered you the job for the
9    second time?
10       A.   The second -- you mean --
11       Q.   Well, the first time was somewhere
12   around February of 1998?
13       A.   Correct.
14       Q.   And then when were you offered the
15   second position that you then took?
16       A.   2002 lieutenant Gomes called me at home
17       --
18       Q.   Let's go back.
19       A.   All right.
20       Q.   In or about February of 1998 you signed
21   this form, and you took a job with Chatham
22   rather than Harwich, correct?
23       A.   Correct.
24       Q.   Harwich offered you a job?
```

1        A.   Correct.
2        Q.   And according to Exhibit 4, to make this
3    easier, you started as assistant dispatcher
4    July 1st 1999; is that correct?
5        A.   Correct.
6        Q.   When were you offered that job, was the
7    same year -- shortly before that?
8        A.   Sorry?
9        Q.   Shortly before July 1st 1999?
10       A.   Yes.
11       Q.   And why as assistant dispatcher instead
12   of a full-time dispatcher?
13       A.   Because they had a dispatcher that was
14   leaving, but he had extensive vacation time,
15   so until he was technically had gone off the
16   payroll, they couldn't put me in his spot.
17            So they hired me and named me as an
18   assistant, until his vacation time was up, so I
19   could take over his position.
20       Q.   And according to Exhibit 9 through 11,
21   it appears that that happened effective date
22   December 1st of 1999, the full-time
23   dispatcher; is that correct?
24       A.   Correct.

1      Q.   And who would evaluate you?

2      A.   The sergeant in charge of my shift.

3      Q.   And who was that?

4      A.   It changed every rotation.  I think

5   Sergeant Wright, I think.  Sergeant Kendrick

6   was one at one point.  Sergeant Jasic.

7      Q.   In all those evaluations, they were all

8   satisfactory?

9      A.   Yes.

10      Q.   Now, did you receive some training to be

11   a dispatcher?

12      A.   Originally, yes.

13      Q.   And when you started in --

14      A.   I believe.

15      Q.   In 1999?

16      A.   I believe through Chatham.

17      Q.   When you came on the job in Harwich, did

18   they show you how their system worked and

19   additional training on their systems?

20      A.   Yes.

21      Q.   And their procedures and policies?

22      A.   Yes.

23      Q.   And the departmental policies?

24      A.   Yes.

1      Q.   And not exactly the same at Chatham?

2      A.   Right.

3      Q.   And did they send you to any special

4   schools of any kind?

5      A.   I don't recall specifically.  Because we

6   had to continuously update, and as they

7   required more of the dispatchers, you had to

8   get that training.

9      Q.   And you went for those trainings to keep

10  up-to-date.

11     A.   Yes.

12     Q.   Now, Chief Mason was chief when you

13  finished your probationary period?

14     A.   Yes.

15     Q.   So you had a different badge when you

16  finished your probation period?

17     A.   No.

18     Q.   Did you have a badge?

19     A.   Yes.

20     Q.   They had not started that with the

21  different badge yet?

22     A.   No, I --

23     Q.   Any ceremony when you finished the

24  probation period?

1      A.    No.

2          Q.    Prior to the finishing of the

3      probationary period did you ever -- did anyone

4      ever express any dissatisfaction with your

5      performance?

6          A.    No.

7          Q.    Did you receive any negative

8      evaluations?

9          A.    No.

10          Q.    Any discipline prior to that time?

11          A.    No.

12          Q.    Now, at some point you resigned the

13      position as full-time dispatcher?

14          A.    Yes.

15          Q.    And about when was that?

16          A.    2000.  I don't remember -- I don't

17      recall the -- it specifically without looking.

18          Q.    If I suggested to you that you -- on or

19      about January 9th 2001, you stopped as a

20      full-time dispatcher?

21          A.    Correct.

22          Q.    And that was through -- that was to

23      attend some more schooling?

24          A.    Correct.

1       Q.   Now, did you -- did you continue as an

2    employee of the Town of Harwich?

3       A.   I did.

4       Q.   And did you continue as an employee of

5    the Town of Harwich until June 17th of 2003

6    when you were discharged?

7       A.   I did.

8       Q.   Any break in service at any time during

9    that period?

10       A.   Never.

11       Q.   And after you resigned as a full-time

12    dispatcher, what position did you keep doing?

13       A.   I stayed on as a special police officer,

14    as an animal control officer, and I did fill

15    in dispatch shifts when they needed help.

16              And I also filled in as a records

17    clerk a couple of times when vacations clashed

18    and they needed an extra body in there.

19       Q.   And there was a separate appointment for

20    an animal control officer?

21       A.   I believe so.  It's not something that

22    everybody does.

23       Q.   Is that your understanding?

24       A.   Yes.

1      Q.   And who appointed you as an assistant
2   animal control officer?
3      A.   Chief Mason.
4      Q.   Was there a different rate of pay, or
5   the same rate of pay?
6      A.   I believe it was a different -- sorry, I
7   believe it was the same rate of pay as a
8   special police officer.
9      Q.   Now, you had annual appointments as a
10   special police officer?
11      A.   Yes.
12      Q.   And you got re appointed annually?
13      A.   Yes.
14      Q.   And when was your first appointment,
15   when you first started as assistant
16   dispatcher, about July of 1999?
17      A.   No.   After I completed the reserve
18   academy, I believe late 1999, early 2000.
19      Q.   Do you know when your second appointment
20   was?
21      A.   Not off the top of my head.
22      Q.   Was that by Chief Mason, though?
23      A.   Yes.
24      Q.   Sometime in 2000?

1        A.    Yes.

2        Q.    And in 2001 -- he appointed you in 2001

3    and 2002?

4        A.    Yes.

5        Q.    Now, Ms. Jones at some point you were

6    rehired as a full-time dispatcher, correct?

7        A.    Correct.

8        Q.    And you continued to be a special police

9    officer in assisting the animal control

10   officer?

11       A.    Correct.

12       Q.    And what led to your going back to your

13   full-time duties as a dispatcher?

14       A.    Lieutenant Gagnon called and asked if I

15   would be interested in a full-time position.

16       Q.    He called you?

17       A.    He did.

18       Q.    And what did he say?

19       A.    He said, "Would you be interested in a

20   full-time position?"

21             And I said, "Yes, doing what?"  I

22   thought he was offering me a patrol job.

23       Q.    You had -- were you interested in a

24   patrol job?

1       A.    Yes.

2       Q.    And you made that known to people?

3       A.    Yes.

4       Q.    And that is why you had taken all the

5    criminal justice courses?

6       A.    Yes.

7       Q.    And did you ever get offered a full-time

8    patrol job by Harwich?

9       A.    No.

10      Q.    Now, so you asked lieutenant Gagnon as

11   what, and what did he tell you?

12      A.    He said dispatching.

13      Q.    What is your reaction?

14      A.    Initially I said, no, I did not want to

15   be a dispatcher.

16      Q.    And did you tell him why?

17      A.    Yes.

18      Q.    What did you say?

19      A.    He said something along the lines of, I

20   remember specifically him saying, "...a foot

21   in the door for a patrol position," I could

22   consider it a foot in the door for a patrol

23   position if I came back as a full-time

24   dispatcher.

1       A.   Never.

2       Q.   Did lieutenant Gagnon say anything to

3    you about serving a probation period?

4       A.   No.

5       Q.   Did he report to you anything about the

6    chief, would have you have a probation period?

7       A.   No.

8       Q.   Did anybody at all, from the town, at

9    all, tell you anything about serving a

10   probationary period?

11      A.   No.

12      Q.   Did you believe you were asked to serve

13   another probationary period?

14      A.   No.

15      Q.   And what was your understanding?

16      A.   My understanding was, that I was being

17   reclassified from part-time back to full-time.

18      Q.   Did somebody -- and someone sent you out

19   over to town hall to fill out some papers; is

20   that true?

21      A.   Yes.

22      Q.   And did anyone at town hall say anything

23   to you about a probationary period?

24      A.   No.

1      A.   Never.

2      Q.   Were you so inebriated that you didn't

3    have a clue?

4      A.   No.  I was cooking all night.

5      Q.   You were cooking?

6      A.   Yes.

7      Q.   You were a union official?

8      A.   I was.

9      Q.   When did you become a union official?

10     A.   Shortly after I came back as a full-time

11   dispatcher second time.

12     Q.   And there are not many women in the

13   Harwich Police Department?

14     A.   No.

15     Q.   Still aren't?

16     A.   No.

17     Q.   And how is the relationship between the

18   union and management?

19     A.   Tense.

20     Q.   Over what issues?

21     A.   At the time, I believe it was every time

22   policies and zeroing out hours for details and

23   bike patrols, and a couple of other things

24   that I don't remember off the top of my head.

```
1         Q.   And were you part of those meetings on
2     behalf of the union?
3         A.   Yes.
4         Q.   Now, were you -- you were evaluated, you
5     say, when you were here, when you were working
6     officially as a full-time dispatcher?
7         A.   Sorry.
8         Q.   When you were first hired as a full-time
9     dispatcher, you had fairly regular evaluation,
10    correct?
11        A.   Yes.
12        Q.   And we got the last one, and it was
13    outstanding?
14        A.   Right.
15        Q.   When you came back, did you have any
16    nore evaluations?
17        A.   No.
18        Q.   No official evaluations of any kind?
19        A.   They had stopped doing that.
20        Q.   And did they evaluate you, anyone, any
21    further?
22        A.   No.
23        Q.   Despite the fact that you are now a
24    probationary employee?
```

1       A.   Correct.

2       Q.   And did they give you new or additional

3   training?

4       A.   No.

5       Q.   Did they make you go through a big

6   refresher course of some kind?

7       A.   No.

8       Q.   Did they give you counseling as an

9   employee?

10      A.   No.

11      Q.   Did they give you any special thing in

12  how you would work, or how you work as a new

13  employee?

14      A.   No.

15      Q.   Any supervision, any different than it

16  did before?

17      A.   No.

18      Q.   Were you discharged for cause?

19      A.   No.

20      Q.   Did you do anything wrong?

21      A.   No.

22      Q.   Without going deep into it, was there

23  anything to the allegation --

24          MR. GILMAN:  Objection.  That has to

1     top of his head?

2         A.   He did not.

3         Q.   Did he get back to you with an answer?

4         A.   Yes.

5         Q.   What was that about?

6         A.   He called the department.  And I

7     actually took the phone call downstairs in the

8     weight room, and he told us that she would

9     lose her seniority based on the contract that

10    the leave was greater than six months.

11        Q.   Now, was the word probation mentioned?

12        A.   No.

13        Q.   Was it ever mentioned?

14        A.   Not to me.

15        Q.   Had lieutenant Gagnon ever mentioned

16    that in your presence?

17        A.   No.

18        Q.   Did he say that Ms. Jones would have to

19    serve a probationary period?

20        A.   No.

21        Q.   Did you ever hear the chief tell her

22    that she would have to serve another

23    probationary period?

24        A.   No.

1      Q.   Any documentation to that effect?

2      A.   No, I did not see any.

3      Q.   Did management ever take it up with the

4   union?

5      A.   No, they did not.

6      Q.   And there was a meeting, a union meeting

7   about the same time in which, now, which Ms.

8   Jones was introduced as a union member?

9      A.   Since Detective Brackett did bring it

10  up, it does refresh my memory on that.  And I

11  do not believe that at that -- at the time of

12  the meeting, she had actually been appointed

13  as a full-time dispatcher again.

14              THE ARBITRATOR:  I would interject.

15              The witnesses were sequestered, and

16      this witness, as president of the union, was

17      present during testimony, and as an assistant

18      to counsel.

19              You had the opportunity to hear that

20      in testimony, and it may have been from Mr.

21      Cronin, I believe?

22              THE WITNESS:  No.  Detective

23      Brackett.

24              THE ARBITRATOR:  Brackett.  All

1      Q.    When did you first learn that management

2      took the view that she was serving probation?

3          A.    After or during -- after or during the

4      termination process.

5          Q.    When she received the termination

6      letter, because she was terminated as an

7      at-will employee?

8          A.    Correct.

9          Q.    Some questions have come up about the

10     relationship between management and the union,

11     were there any disputes during this time

12     period when Ms. Jones was secretary?

13         A.    Yes.

14         Q.    And what are the issues?

15         A.    At that time the -- I believe she said

16     the major one had to do with the zeroing of

17     hours, over time hours, and I don't how to

18     describe that.  There was a policy issued by

19     Chief Mason.

20         Q.    And was that a source of some dispute

21     between the union and management?

22         A.    Yes, it was.

23         Q.    And was Ms. Jones present in

24     participating in those meetings?

1    A.   Yes.

2    Q.   And was she a vocal participant?

3    A.   I believe we all were.  Our meetings

4    with the chief, never had been that formal,

5    always been able to go in, so it was, it was

6    discussed by everyone.

7    Q.   And, sir, how many union officers are

8    there?

9    A.   Presently?

10   Q.   Yes?

11   A.   Two.

12   Q.   And was there a time with Ms. Jones that

13   there were four?

14   A.   Yes.

15   Q.   President, vice-president, secretary,

16   and who was the fourth?

17   A.   Terry Dinnan.

18   Q.   What is his position?

19   A.   Treasurer.

20   Q.   And there was a treasurer.  Was there a

21   time when all four union members were the only

22   people in the department that had been subject

23   to discipline?

24   A.   I believe it was.